OPINION OF THE COURT
Dianne T. Renwick, J.
Greg Starr, Esq. petitions this court, pursuant to Judiciary Law § 475, for a determination on a fee dispute with Harry Issler, Esq. The lawyers had executed a fee sharing agreement at the inception of this medical malpractice action that was settled shortly before trial. The dispositive issues before this court are: (1) whether the fee sharing agreement was extinguished when Mr. Starr signed a new retainer agreement with the client, purportedly making him the new attorney of record and removing Mr. Issler from the case, and (2) if not, whether the fee sharing agreement, by which Mr. Issler remained the attorney of record and Mr. Starr took primary responsibility for prosecution of the action, is nevertheless unenforceable as contravening the Code of Professional Responsibility.
Attorneys’ Fees Hearing
In accordance with the order of this court dated January 25, 2002, a hearing was held on the issue of apportionment of legal fees. At the hearing, Harry Issler, Esq., Greg Starr, Esq., and *651 Andrew Health, Esq. (the attorney for defendant) testified. The court had the opportunity to hear their testimony, evaluate their demeanor and consider those exhibits admitted into evidence.
Harry Issler, Esq., asserts that in April 1999, plaintiffs Rose and Simone Aiello retained his service on a contingency basis to represent their medical malpractice claims against Uriel Adar, M.D. After obtaining the pertinent medical records and consulting with a medical expert, Mr. Issler prepared, filed and served the summons and complaint, and the certificate of merit, in or about May 1999.
In August of 1999, Mr. Issler referred the case to Mr. Starr, pursuant to a memorialized fee sharing agreement. They agreed to share 50% each of the contingency fee. While Mr. Starr agreed to share “primary responsibility,” Mr. Issler agreed to remain the attorney of record in the action. A month before the fee sharing was executed, Mr. Starr entered into an agreement to sublease space from Mr. Issler’s midtown suite. Mr. Issler permitted Mr. Starr to use the office paralegal and secretary for an unspecified fee. Mr. Issler intended to refer numerous cases to Mr. Starr.
Greg Starr, Esq., asserts that, after Mr. Issler referred him the medical malpractice action in August 1999, Mr. Starr handled every aspect of the case, until its settlement in October 2001, and Mr. Issler did not have any other involvement with the case. Specifically, Mr. Starr claims that he was the only attorney active in the case during all of the discovery proceedings, including completing the discovery demands and responses, and all depositions. Mr. Starr alleges that he also had to consult with a medical expert, different from the expert with whom Mr. Issler had originally consulted, because the original theory of the case under which the case was commenced was inadequate.
Mr. Issler disagrees that he did not have any involvement in the case after he referred it to Mr. Starr. Mr. Issler asserts— and Mr. Starr acknowledges — that all the court papers prepared in the case were filed in the name of Mr. Issler as the attorney of record and Mr. Starr as counsel. In addition, Mr. Issler claims that he reviewed every court document prepared in the case as the attorney of record, and that he was involved in the preparation of various court documents including the bill of particulars. Mr. Issler reportedly responded to and prepared discovery demands and filed the note of issue. He also kept the client abreast of the status of the case. It is undisputed *652 that all the disbursements and costs were incurred by Mr. Issler.
The working relationship between Mr. Issler and Mr. Starr began to turn acrimonious in June of 2001, when Mr. Issler was forced to move out of his midtown suite; his landlord refused to renew his lease. Mr. Starr claims that Mr. Issler rented new space, without his knowledge, and refused to sublease him part of the suite. According to Mr. Starr, when Mr. Issler abandoned the old suite, he left behind the file of the instant action, as well as the other cases that Mr. Issler had referred to him. Subsequently, Mr. Starr informed the Aiello plaintiffs that he was unwilling to continue working in the case because “Mr. Issler was unwilling to take the case forward and because [Mr. Starr] was unwilling to continue the case under the 50/50, fee-sharing arrangement.” Plaintiffs reportedly told Mr. Starr that “they wanted [him] to continue with the case and that as far as they were concerned [Mr. Starr] was their attorney.”
When Mr. Issler refused to consent to his substitution, Mr. Starr prepared a change of attorney form, which both Mr. Starr and plaintiffs signed on August 28, 2001. At the same time, Mr. Starr and plaintiffs signed a new retainer agreement by which Mr. Starr agreed to handle the case on a contingency basis. Mr. Starr claims that he presented the signed change of attorney form to the justice presiding in the part at that time. Mr. Starr, however, has no proof of any kind, like the minutes of the proceedings or a court order to that effect, to corroborate his allegations. Nor does Mr. Starr have any recollection of when and where the justice would have approved the change of attorney. Mr. Starr acknowledges that he never made a formal motion for a change of attorney on notice to Mr. Issler and claims that the court approval was done ex parte.
Mr. Issler denies ever receiving notice from either the plaintiffs or Mr. Starr about the substitution of counsel. When Mr. Issler reportedly learned for the first time that Mr. Starr was unhappy with the fee sharing agreement, he allegedly informed Mr. Starr to return the case files to him. Mr. Issler, however, claims that he never heard from Mr. Starr until Starr sent him a copy of the substitution of counsel form signed by the Aiello plaintiffs and Mr. Starr. Soon thereafter, Mr. Issler reportedly informed Mr. Starr of his objection to the substitution.
Meanwhile, Mr. Starr continued handling the case and in October 2001, the case settled shortly before jury selection was *653 to commence, for $135,000. Counsel for defendant then issued a check for that amount in the name of Mr. Starr and plaintiffs Rose and Simone Aiello. Counsel for defendant, Mr. Health, testified at the hearing that Mr. Starr was the only attorney he had dealt with during all the proceedings in the case. Mr. Starr has offered to pay Mr. Issler for the cost and disbursements incurred in the case. Mr. Starr, however, refuses to pay Mr. Issler according to the fee sharing agreement; he has offered to pay him on a quantum meruit basis, based on the time and effort each attorney spent in the case. Mr. Starr estimates that he performed 96% of the work in the case, and that Mr. Issler performed the remaining 4%. When Mr. Issler refused to accept less than 50% as stipulated in the fee sharing agreement, Mr. Starr instituted this petition for a determination of the fee dispute pursuant to Judiciary Law § 475.
Discussion
Where there is an express contract for compensation, an action will not lie for quantum meruit. (Foster v White & Sons, 244 App Div 368, 371, affd 270 NY 572 [1936]; Jontow v Jontow, 34 AD2d 744 [1st Dept 1970].) This principle applies to the awarding of attorneys’ fees. (Jontow v Jontow, supra; Murray v Waring Hat Mfg. Co., 142 App Div 514, 517 [2d Dept 1911].) Accordingly, where there is an express contract, as here, providing for a fee division between counsels, the fees due to referring counsel and the attorney to whom the case was referred are not to be determined based on quantum meruit. (Jontow v Jontow, supra; Sterling v Miller, 2 AD2d 900 [2d Dept 1956], affd 3 NY2d 778 [1957].)
A. Whether Fee Sharing Agreement Has Been Extinguished?
Despite the presence of the fee sharing agreement he had entered with Mr. Issler, Mr. Starr now argues that the determination of the fee dispute should be quantum meruit, based on the percentage of work performed by each attorney. First Mr. Starr argues that the fee sharing agreement was extinguished when Mr. Starr simultaneously executed a new retainer agreement and a change of attorney form with plaintiffs, purportedly making him the new attorney of record in the case and thereby extinguishing the fee sharing agreement he had with Mr. Issler. While this court has serious doubts whether a fee sharing agreement can be extinguished by a client unilaterally replacing an attorney of record with an attorney with whom the client has made a new agreement, this court does not have to address this question. Instead, this court *654 finds that Mr. Starr’s attempt to become the attorney of record was rendered invalid by plaintiffs’ failure to comply with the prescribed method of substitution.
It is a bedrock principle of the law that a client may discharge his/her attorney with or without cause. (Robinson v Rogers, 237 NY 467 [1924].) However, for a change of attorney to take effect during an action, the parties must comply with the mode of discharge prescribed by statute. Specifically, CPLR 321 (b) provides that once a lawyer appears in an action, there are two ways he/she can get out or be removed from the case. First, when the change of attorney can be effected by agreement, the party and the outgoing attorney can simply file a jointly-signed consent (with acknowledgment of the client) with the clerk and serve notice of the change of attorney on the other parties. (CPLR 321 [b] [1].) If consent is lacking, judicial intervention is required for substitution of counsel. A motion must be made upon such notice as the court may direct, i.e., by order to show cause. (Id.) The notice of such a motion must be given to all the parties and counsels involved in the case. (CPLR 321 [b] [2].) Until the attorney is removed by a court order or by stipulation, his/her status as attorney of record continues unabated. (Moustakas v Bouloukos, 112 AD2d 981 [2d Dept 1985].)
The rule has generally been applied to afford protection to adverse parties, by eliminating dispute and uncertainty as to whether and when the authority of an attorney representing an opponent terminated. (MacArthur v Hall, McNicol, Hamilton & Clark, 217 AD2d 429 [1st Dept 1995]; Moustakas v Bouloukos, 112 AD2d 981 [2d Dept 1985]; see also, Blondell v Malone, 91 AD2d 1201 [4th Dept 1983].) For instance, in Cippitelli v County of Schenectady (284 AD2d 823 [3d Dept 2001]), defendant moved to dismiss the complaint for plaintiff’s failure to comply with discovery demands. (Id.) The motion was considered unopposed when the affidavit in opposition was submitted by an attorney purporting to represent plaintiff for whom plaintiff had not submitted a change of attorney form. (See also, Eveready Ins. Co. v De Leon, 287 AD2d 536 [2d Dept 2001].)
Although CPLR 321 (b) “has generally been construed to establish the authority of discharged counsel as to adverse parties and not as to the very party who discharged the attorney” (Moustakas v Bouloukos, 112 AD2d 981, 984), the language of the statute makes no such distinction. (See MacArthur v Hall, McNicol, Hamilton & Clark, 217 AD2d 429 [1st Dept 1995].) *655 Accordingly, the statute has been construed to “further [the] salutary purpose of protecting parties from attorneys who represent other parties in the action.” (Moustakas v Bouloukos, 112 AD2d 981, 984 [2d Dept 1985].) For instance in Moustakas v Bouloukos (supra, 112 AD2d 981), a client discharged his counsel and, without filing a stipulation of withdrawal or obtaining a court order, proceeded into the action pro se for the purpose of entering into a settlement with the adverse party. The Court held that a client who entered into a settlement should be allowed to rescind the settlement agreement on the ground that the formalities of CPLR 321 (b) had not been followed; in the absence of such compliance, the Court reasoned, the client is still considered represented by counsel of record, thereby prohibiting the opponent’s attorney from communicating directly with the client. (Id.; but see, Imor v Imor, 119 AD2d 913 [3d Dept 1986].)
Here, as a preliminary matter, this court gives no credence to Mr. Starr’s assertion that he obtained court approval for the substitution of Mr. Issler as the attorney of record. This court finds it highly irregular that a judge would grant an ex parte application for the removal of an attorney of record, without the attorney’s knowledge or consent and without memorializing such a significant decision in writing. Indeed, the law is clear that “[a] purported withdrawal without proof that reasonable notice was given is ineffective.” (Matter of Tierra C., 227 AD2d 994, 995 [4th Dept 1996]; see also, Matter of Kwasi S., 221 AD2d 1029 [4th Dept 1995]; Bucaro v Keegan, Keegan, Hecker & Tully, 126 Misc 2d 590 [Sup Ct, NY County 1984].)
This court sees no valid logical or policy consideration for not extending the protections of CPLR 321 (b) to the circumstances of this case, to protect a lawyer who has been discharged as counsel of record in violation of the statute. Indeed, whether an attorney should be involuntarily deprived of his fee is a matter of great significance which should be determined by a court. In fact, given the absence of the required judicial intervention, no determination was ever made whether plaintiffs had any justifiable reason for replacing Mr. Issler, other than Mr. Starr’s unhappiness with his fee sharing agreement — which would not have been a valid reason, in this court’s view, for depriving Mr. Issler of the benefits of the fee sharing agreement.
Moreover, policy considerations militate against permitting an attorney who has been hired via a fee sharing agreement to obtain the substitution of the attorney of record in a manner *656 that does not comply with CPLR 321 (b). A contrary rule would reward an attorney for his improper behavior. This court cannot condone plaintiffs’ removal of the attorney of record, Mr. Issler, in contravention of CPLR 321 (b), at the behest of an attorney, Mr. Starr, who now wishes to use such violation to shield himself from his legal, moral and ethical obligations. A contrary rule would foster contentious relations between attorneys and their clients. Thus, this court finds that the attempts to remove Mr. Issler from the case are rendered ineffective by CPLR 321 (b).
B. Whether Fee Sharing Agreement Is Rendered Void by Code of Professional Responsibility DR 2-107 (22 NYCRR 1200.12)?
Mr. Starr next claims that the fee sharing agreement is unenforceable as a matter of public policy, i.e., because it violates the Code of Professional Responsibility. As a general rule, an agreement between attorneys will be upheld as valid and enforceable by the courts “in accordance with [the] terms [set forth in the agreement] provided that the attorney who seeks his share of the fee contributed some work, labor or service toward the earning of the fee.” (Grasso v Kubis, 198 AD2d 811, 812 [4th Dept 1993], quoting Oberman v Reilly, 66 AD2d 686, 687 [1st Dept 1978].) There is no requirement that the compensation be in proportion to work actually performed. (Oberman v Reilly, supra.) However, there must be a showing that the forwarding attorney did more than a mere recommendation of a lawyer. (Benjamin v Koeppel, 85 NY2d 549 [1995]; Nicholson v Nason & Cohen, 192 AD2d 473 [1st Dept 1993].)
In addition, recent court pronouncements had made it abundantly clear that a fee sharing agreement would be void as against public policy and unenforceable by the courts unless it also complies with the Code of Professional Responsibility. (See e.g., Ford v Albany Med. Ctr., 283 AD2d 843, 843-844 [3d Dept 2001]; Dugan v Dorff Constr. Co., 281 AD2d 158, 159 [1st Dept 2001].) In 1990, the Code of Professional Responsibility was significantly revised so that DR 2-107 (a) (22 NYCRR 1200.12 [a]) now reads:
“(a) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of the lawyer’s law firm, unless:
“(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
“(2) The division is in proportion to the services performed by each lawyer or, by a writing given to *657 the client, each lawyer assumes joint responsibility for the representation.
“(3) The total fee of the lawyers does not exceed reasonable compensation for all legal services they rendered the client.”[1] (Code of Professional Responsibility DR 2-107 [a].)
The New York Code thus allows fee sharing between lawyers not associated in a law firm on two different bases, both requiring a client’s consent after full disclosure. (DR 2-107 [a] [1] [22 NYCRR 1200.12 (a) (l)].)[2] If both lawyers work on the matter, the fee may be divided in proportion to the services performed by each lawyer. (DR 2-107 [a] [2] [22 NYCRR 1200.12 (a) (2)].) Alternatively, the fee may be divided without regard to that proportion if each lawyer “by a writing given the client * * * assumes joint responsibility for the representation.” (Id.; see e.g., Ford v Albany Med. Ctr., supra, 283 AD2d 843, 843-844 [3d Dept 2001] [Court held that fee sharing agreement was unenforceable because referring attorney did not assume joint responsibility for the representation]; Dugan v Dorff Constr. Co., supra, 281 AD2d 158, 159 [split agreement void where counsel did minimal work and did not undertake joint responsibility].)
Here, the court finds that the fee sharing agreement between Mr. Issler and Mr. Starr comports fully with the legal and ethical requirements. First, there should be no doubt that Mr. Issler took a more active role in the action than merely referring the case to Mr. Starr. This much is not in dispute: Mr. Issler did all the preliminary work in the case necessary for preparing and servicing the summons and complaint, including consulting with a medical expert and garnering all the pertinent medical records. Although there is dispute as to the work that Mr. Issler performed after the case was referred to Mr. Starr, the court is satisfied, from the undisputed evidence, that Mr. Issler provided sufficient services toward earning a fee and that such services are consistent with the ethical guidelines and applicable case law. (Cf. Krug v Offerman, Fallow, Mahoney & Cassano, 214 AD2d 889 [3d Dept 1995]; Witt v Cohen, 192 AD2d 528 [2d Dept 1993].)
*658 Secondly, this court is convinced that plaintiffs consented to the employment of Mr. Starr, as counsel to Mr. Issler, after full disclosure that a division of fees would be made between them pursuant to the fee sharing agreement. Indeed, there is no dispute that plaintiffs were aware of Mr. Starr’s involvement in the case since its inception. In addition, no claim has been made that the Aiello plaintiffs were not provided a copy of the fee sharing agreement. Moreover, this court, as factfinder, must draw an inference against Mr. Starr, as the party who seeks to undermine the fee sharing agreement, for his failure to produce any of the Aiello plaintiffs. Such failure indicates that none of the plaintiffs’ testimony would have been in Mr. Starr’s favor on the issue of whether plaintiffs consented to the fee sharing agreement after full disclosure. In fact, in support of his petition Mr. Starr submitted an affidavit from one of the plaintiffs, in which no claim is made that they were unaware of the fee sharing agreement. Under the circumstances, the only inference that can be drawn from the evidence presented is that plaintiffs were aware of Mr. Starr’s employment in the case pursuant to the fee sharing agreement.
While the court is satisfied that there was full disclosure of the fee sharing agreement, the issue remains whether the agreement contains the necessary language to demonstrate that Mr. Issler intended to assume joint responsibility of the action. In this case, the division of fees stipulated in the fee sharing agreement would not be in proportion to the services performed by each lawyer. The adduced evidence makes clear that Mr. Starr did the predominant amount of work; yet, the agreement divides the fees evenly, 50% each. In such a situation, as noted above, the Code of Professional Responsibility requires that “each lawyer assumes joint responsibility for the representation,” in writing. (DR 2-107 [a]. [2] [22 NYCRR 1200.12 (a) (2)]; see also, Ford v Albany Med. Ctr., 283 AD2d 843, 843-844 [3d Dept 2001].)
Unfortunately, the term “joint responsibility” is not defined either by the Code or case law. During debate on the revisions to DR 2-107 before the New York State Bar’s House of Delegates in 1987, some attention was given to this “joint responsibility” requirement. (See Gross, The Long Process of Change: The 1990 Amendments to the New York Code of Professional Responsibility, 18 Fordham Urb LJ 283, 308.) However, it is unclear whether the state bar intended joint responsibility to entail broad supervisory duties over the receiving lawyer’s activities or to consist primarily of financial liability. (Id.) Nor has any court had the opportunity to define the term.
*659 The commentary to the Model Rules of Professional Conduct (hereinafter referred to as Model Rules) refers to the obligations contained in rule 5.1, the analogous provisions of which are found in Code of Professional Responsibility DR 1-104 (22 NYCRR 1200.5). The ABA Committee on Ethics and Professional Responsibility, in Informal Opinion 85-1514, interpreted this responsibility broadly, holding that the “assumption of joint responsibility includes assumption of responsibility comparable to that of a partner in a law firm under similar circumstances.” (Id.) This “comparable” responsibility includes “financial responsibility, ethical responsibility to the extent a partner would have ethical responsibility for actions of other partners in a law firm in accordance with Rule 5.1, and the same responsibility to assure adequacy of representation and adequate client communication that a partner would have for a matter handled by another partner in the firm under similar circumstances.” (ABA Comm on Ethics and Prof Responsibility, Informal Op 95-1514 [1985].)
The Committee on Professional Ethics of the New York County Lawyers’ Association, on the other hand, has interpreted this responsibility narrowly, holding in an ethics opinion that the “ ‘joint responsibility’ requirement is financial and does not create an ethical obligation of the referring lawyer to supervise the activities of the receiving lawyer.” (NY County Lawyers’ Assn Ethics Op 715, reprinted in NYLJ, July 2, 1996, at 4, cols 4, 5.) This interpretation “is based on the requirement in the Code of a writing, which,” according to the committee, “indicates the rule was intended to add to the protection otherwise available to the client, i.e., to provide a contractual remedy in addition to the remedy available under the law of negligence.” (Id.) Because “a lawyer is liable for his or her own failure to exercise due care, the writing given to the client must create some additional vicarious liability on the part of the referring lawyer in order to satisfy DR 2-107,” the committee reasons. (Id. at cols 5-6.)
Besides being consistent with the plain language of the Code, the narrower definition, in this court’s view, is the more pragmatic approach. The allowance of fee sharing is intended to permit an association of more than one lawyer, as when the matter is referred to a trial counsel, “in a matter in which neither alone could serve the client as well.” (Lawyers’ Manual on Professional Conduct 1:101 [ABA/BNA], Comment, Model Rules, rule 1.5.) “[I]t eliminates the disadvantage to lawyers in small firms who may be unable to refer matters to a more quali *660 fied. partner and receive a share of the fees.” (NY County Lawyers’ Assn Ethics Op 715, citing Marjorie E. Gross, The Long Process of Change: The 1990 Amendments to the New York Code of Professional Responsibility, 18 Fordham Urb LJ 283, 307 [1991].) However, it does not make much pragmatic sense that a lawyer would be expected to supervise the handling of a matter by a specialist, who is more familiar with the case and generally more competent in the type of action involved than the referring attorney.
This court’s view, therefore, is that joint responsibility is synonymous with joint and several liability. When lawyers assume “joint responsibility” in order to share a fee under DR 2-107 without regard to work performed, they are ethically obligated to accept vicarious liability for any act of malpractice that occurs during the course of the representation. Although the harsh financial consequences of DR 2-107 create a strong incentive for the referring lawyer to keep himself/herself abreast of the manner in which the matter is being handled by the receiving lawyer, the rule does not create an ethical obligation to supervise the receiving attorney’s work.
Applying the narrower definition of the term, this court finds that the fee sharing agreement between Mr. Starr and Mr. Issler contains sufficient language indicating Mr. Issler’s intent to share “joint responsibility” for the referred action. First, the agreement states that Mr. Starr would- share “primary responsibility” for the action. This language indicates, albeit implicitly, that Mr. Issler would assume responsibility of the action as well, and in no way limits the client’s rights against Mr. Issler. More importantly, the agreement contains the language that Mr. Issler would remain the attorney of record in the case, which is an unequivocal indication that he was putting his malpractice coverage on the line for any acts done by Mr. Starr on behalf of the client. Under the circumstances, this court is satisfied that the fee sharing agreement expresses Mr. Issler’s clear intention to remain vicariously responsible for any act of malpractice that could have occurred during the course of the representation of the Aiello plaintiffs, thus meeting the assumption of “joint responsibility” requirement of DR 2-107.
Conclusion
In short, since a statutory lien, pursuant to Judiciary Law § 475, exists in favor of Harry Issler, Esq. as the attorney of record, this court is limited to determining the extent of this *661 lien and to direct its payment. (See Barnum v Srogi, 96 AD2d 723 [4th Dept 1983].) The lien is clearly subject to the fee sharing agreement, which this court finds has not been extinguished by the purported attempts to remove Mr. Issler from the case, and the agreement comports fully with the Code of Professional Responsibility. (Cf. Benjamin v Material Damage Adj. Corp., 275 AD2d 527 [3d Dept 2000].) Therefore, Harry Issler is entitled to 50% of the amount held by Mr. Starr.
For the foregoing reasons, it is hereby ordered that this petition is granted in favor of Mr. Harry Issler, Esq., to the extent of granting him a lien, pursuant to Judiciary Law § 475, against the proceeds of the settlement of this action, subject to the fee sharing agreement entered into with Greg Starr, Esq.; it is further ordered that Mr. Greg Starr must satisfy such statutory lien forthwith to the extent of disbursing to Mr. Issler 50% of the contingency fees stemming from the settlement proceeds generated in this action.

. The 1990 amendment to the Code substantially conforms the Code to the Model Rules of Professional Conduct. (Compare Model Rules of Professional Conduct rule 1.5 [e], with Code of Professional Responsibility DR 2-107 [a] [22 NYCRR 1200.12 (a)].)

. In addition, the total fee may not exceed reasonable compensation for the services rendered. (Code of Professional Responsibility DR 2-107 [a] [3] [22 NYCRR 1200.12 (a) (3)].)