OPINION OF THE COURT
 

 Titone, J.
 

 Can an attorney who has not complied with Judiciary Law § 468-o’s registration requirements nonetheless recover payment for professional legal services rendered during the period of noncompliance? Concluding that the public policies underlying the State’s attorney-registration system do not furnish a reason to nullify otherwise valid contractual obligations, we hold that the failure to register does not preclude an attorney’s recovery of professional fees.
 

 Plaintiff was admitted to the Bar in 1958 after complying with the applicable educational, examination and character requirements. However, he did not register with the Office of Court Administration (OCA) when the mandatory registration
 
 *552
 
 rules were enacted in 1981 (L 1981, ch 714). Plaintiff, who apparently had not maintained a law office during the intervening 10 years, registered for the first time in April 1991, after the present action was commenced. At that time, he paid all of his delinquent fees.
 

 The present action arose out of an incident in which plaintiff referred a potential client with a real property tax matter to defendant law firm, Koeppel, Del Casino & Martone, P. C. The firm, in turn, agreed to pay plaintiff one third of any fees it earned. According to the submissions before the court, plaintiff’s participation included interviewing the client, evaluating the case, discussing the matter with firm attorneys and attending a meeting between the client and a firm partner. The firm successfully completed the real estate matter for the client. Thereafter, plaintiff requested that the successor firm, defendant Koeppel, Martone & Leistman, pay him the agreed-upon share of the firm’s fee. When his request was refused, plaintiff brought the present action.
 

 On cross motions for summary judgment, the Supreme Court granted plaintiff the relief he sought and awarded him damages against the law-firm defendants. In so ruling, the court rejected defendants’ contention that plaintiff should not be permitted to recover a fee because of his failure to register as required by Judiciary Law § 468-a. The court also rejected defendant’s effort to avoid payment on the ground that plaintiff had not earned a one-third fee, noting that papers prepared in connection with the client’s real estate matter showed that plaintiff had performed at least "some services.” The Appellate Division agreed with Supreme Court’s analysis and affirmed the judgment. Defendants then took a further appeal by leave of this Court.
 

 Defendants do not dispute the facial validity of their agreement to pay plaintiff a third of any fee they obtained in connection with the real estate matter that plaintiff had referred. Instead, they argue that the agreement is unenforceable because it involves compensation for professional services and because payment for such services to plaintiff, as an unregistered attorney, would violate public policy. In support, defendants rely heavily on
 
 Galbreath-Ruffin Corp. u 40th & 3rd Corp.
 
 (19 NY2d 354, 364), in which this Court stated that noncompliance with a regulatory statute could " 'affect the legality of [a] business.’ ” For the reasons that follow, we reject defendants’ effort to apply that principle to this situation.
 

 
 *553
 
 "Illegal contracts are, as a general rule, unenforceable”
 
 (Lloyd Capital Corp. v Pat Henehar, Inc.
 
 (80 NY2d 124, 127). However, the violation of a statute that is merely
 
 malum prohibitum
 
 will not necessarily render a contract illegal and unenforceable
 
 (id.).
 
 "If the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy * * * the right to recover will not be denied”
 
 (Rosasco Creameries v Cohen,
 
 276 NY 274, 278).
 

 Fee disputes involving persons who have failed to comply with licensing or registration requirements have spawned their own body of case law
 
 (see, e.g., Lloyd Capital Corp. v Pat Henehar, Inc., supra; Richards Conditioning Corp. v Oleet,
 
 21 NY2d 895;
 
 Rosasco Creameries v Cohen, supra; Johnston v Dahlgren,
 
 166 NY 354;
 
 People ex rel. Nechamcus v Warden,
 
 144 NY 529;
 
 see also, B & F Bldg. Corp. v Liebig,
 
 76 NY2d 689;
 
 Charlebois v Weller Assocs.,
 
 72 NY2d 587).
 
 Galbreath-Ruffln (supra,
 
 at 363-364, quoting
 
 Silinsky v Lustig,
 
 118 Misc 298, 299) established one of the key controlling principles in this area: " '[W]here the procuring of a license is merely for the purpose of raising revenue it would seem that acts performed without securing a license would be valid. But where the statute looks beyond the question of revenue and has for its purpose the protection of public health or morals or the prevention of fraud, a non-compliance with its terms would affect the legality of the business’ ”
 
 (accord, Richards Conditioning Corp. v Oleet, supra; see, e.g., Charlebois v Weller Assocs., supra,
 
 at 592). Two other important tenets that have emerged from the case law are that fee forfeitures are disfavored and that such forfeitures may be particularly inappropriate where there are other regulatory sanctions for noncompliance
 
 (Lloyd Capital Corp. v Pat Henehar, Inc., supra,
 
 at 128;
 
 Charlebois v Weller Assocs., supra,
 
 at 595;
 
 see also, Rosasco Creameries v Cohen, supra,
 
 at 279-280). As this Court stated in
 
 Charlebois v Weller Assocs. (supra,
 
 at 595), the courts are especially skeptical of efforts by clients or customers to use public policy "as a sword for personal gain rather than a shield for the public good.”
 

 Application of these precepts leads to a favorable conclusion for this plaintiff. Initially, there is sound reason to doubt the assumption that Judiciary Law § 468-a’s registration requirements constitute a licensing scheme analogous to the licensing
 
 *554
 
 scheme for engineers that was considered in
 
 Charlebois v Weller Assocs. (supra),
 
 the licensing scheme for real estate brokers that was considered in
 
 Galbreath-Ruffin Corp. v 40th & 3rd Corp. (supra)
 
 and the licensing scheme for milk dealers that was considered in
 
 Rosasco Creameries v Cohen (supra).
 
 One working definition of a "license” is "[a] permit, granted by an appropriate governmental body * * * to a person, firm, or corporation to pursue some occupation or to carry on some business subject to regulation” (Black’s Law Dictionary 829 [5th ed]). In this State, a person is authorized to practice law if that person has been admitted to practice and has taken the requisite oath
 
 (see,
 
 Judiciary Law § 478;
 
 see also,
 
 §§ 466, 476-a [1] [b]). Admission is governed by Judiciary Law §90, which refers only to certification by the State Board of Law Examiners, consideration by the Appellate Division of the applicant’s general fitness and. character and compliance with the Court of Appeals and Appellate Division rules "relating to the admission of attorneys.” Importantly, neither section 90 nor the statute authorizing admitted attorneys to practice law mentions section 468-o’s registration requirement. Moreover, the responsibility for regulating and disciplining admitted attorneys is vested in the Departments of the Appellate Division, not OCA, the entity that administers the registration system
 
 (see,
 
 Judiciary Law §90 [2]). Thus, the registration system does not have the critical earmarks of a licensing or regulatory scheme.
 

 In any event, even if treated as an ancillary licensing or regulatory mechanism, the attorney registration system more closely resembles a revenue-raising measure than a program for "the protection of public health or morals or the prevention of fraud”
 
 (Galbreath-Ruffin Corp. v 40th & 3rd Corp. (supra,
 
 at 364). When section 468-a was first enacted, its stated purpose was to "generate $1,750,000 in estimated [annual] fee revenues,” which were to be used in part to defer certain of OCA’s administrative costs and in part to fund the new Lawyers’ Fund for Client Protection that was created to compensate clients injured by attorney misconduct (Mem in Support of S6709-C and A8709-C, Bill Jacket, L 1981, ch 714). In approving the measure, then Governor Hugh L. Carey stressed that the statute was necessary because New York was "the only state which does not require payment of a statutory license fee” and because attorneys were the only profession not "subject to some fee requirement” (Governor’s Approval Mem, 1981 NY Legis Ann, at 378). According to its sponsor,
 
 *555
 
 the legislation requiring the filing of a registration statement and the payment of a fee "simply and adequately compensates State government for processing the regulation of the profession” (Mem of Senator W. T. Smith, 1981 NY Legis Ann, at 377).
 

 The subsequent amendments to the statute only serve to underscore Judiciary Law § 468-o’s essential purpose as a revenue-raising mechanism. The 1985 amendments were aimed at clarifying the registration obligations of out-of-State attorneys, increasing the registration fee, reducing delinquency in compliance and aiding enforcement (L 1985, ch 730; see, Mem in Support of S5650A, Bill Jacket, L 1985, ch 730; Mem of OCA, July 10, 1985, 1985 McKinney’s Session Laws of NY, at 3541). The 1990 amendments tripled the $100 biannual fee and provided for the allocation of the resulting revenues (L 1990, ch 190).
 

 To be sure, the biannual registration requirement plays some role in the protection of the public, in that it facilitates the maintenance of the official register of attorneys
 
 (see,
 
 Judiciary Law § 468), which, in turn, is helpful in "providing] legal consumers, public officers and members of the bar with a central and readily accessible source of public information concerning the professional standing of persons who are licensed to practice law in this state” (L 1988, ch 67, § 1 [amending Judiciary Law § 468]). However, as Judiciary Law § 468-a’s sponsor observed at the time of the statute’s enactment, "the New York Court of Appeals and Office of Court Administration [have] already provided for a comprehensive, accurate and up-to-date method of listing attorneys who practice in New York” (Mem of Senator W. T. Smith,
 
 op. cit,
 
 at 377). Thus, the new provision’s potential value as a mechanism for tracking attorneys and facilitating their regulation was not considered a particularly important feature of the legislation.
 

 Finally, the existence of a legislatively prescribed sanction for noncompliance militates against imposing a civil forfeiture by nullifying bargained-for contractual obligations. Judiciary Law § 468-a (5) provides that noncompliance with the registration requirement and accompanying rules "shall be referred to the appropriate appellate division.” Further, the Appellate Divisions have not hesitated to impose disciplinary sanctions tailored to the particular case
 
 (see, e.g., Matter of Bridge,
 
 196 AD2d 43;
 
 Matter of Relyea,
 
 175 AD2d 949;
 
 see also, Matter of
 
 
 *556
 

 Larson,
 
 177 AD2d 852;
 
 Matter of Gersman,
 
 171 AD2d 37;
 
 Matter of Taylor,
 
 164 AD2d 699). Thus, there already exists an effective remedy to spur compliance and punish disobedience, and the additional sanction that defendants seek is unnecessary.
 

 This is not to suggest that attorneys’ noncompliance with the registration requirements is to be regarded as inconsequential. To the contrary, we recognize that, as the Legislature has expressly provided, noncompliance is "conduct prejudicial to the administration of justice” that may be disciplined (Judiciary Law § 468-a [5]). We hold only that precluding plaintiff from recovering on his contract with defendants is a remedy that is "wholly out of proportion to the requirements of public policy”
 
 (Rosasco Creameries v Cohen, supra,
 
 at 278).
 

 In closing, we also note our rejection of defendants’ contention that the fee-sharing agreement plaintiff seeks to enforce is invalid as a matter of professional ethics
 
 (see,
 
 Code of Professional Responsibility DR 2-107). It has long been understood that in disputes among attorneys over the enforcement of fee-sharing agreements the courts will not inquire into the precise worth of the services performed by the parties as long as each party actually contributed to the legal work and there is no claim that either "refused to contribute more substantially”
 
 (Sterling v Miller,
 
 2 AD2d 900,
 
 affd
 
 3 NY2d 778;
 
 see, Witt v Cohen,
 
 192 AD2d 528;
 
 Oberman v Reilly,
 
 66 AD2d 686;
 
 Rozales v Pegalis & Wachsman,
 
 127 AD2d 577;
 
 Jontow v Jontow,
 
 34 AD2d 744, 745;
 
 Fried v Cahn,
 
 239 App Div 213;
 
 Carter v Katz, Shandell, Katz & Erasmous,
 
 120 Misc 2d 1009, 1018-1019;
 
 see also, Stissi v Interstate & Ocean Transp. Co.,
 
 814 F2d 848, 852). Moreover, it ill becomes defendants, who are also bound by the Code of Professional Responsibility, to seek to avoid on "ethical” grounds the obligations of an agreement to which they freely assented and from which they reaped the benefits (ABA Comm on Professional Ethics, Informal Opn No. 870).
 

 Here, there were undisputed statements that plaintiff had "worked up” the case and had played a significant role in working with a "difficult” client. There were no allegations that plaintiff had been asked to do additional work and had refused. Hence, he was entitled to his share of the fee as allocated in the parties’ agreement.
 

 
 *557
 
 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order affirmed, with costs.