OPINION OF THE COURT
Lee L. Holzman, J.
In this proceeding in which the court previously approved the distribution of the net proceeds arising from a $750,000 settlement for causes of action for decedent’s personal injuries and wrongful death, the remaining issue is whether objectant, Molod & Berkowitz (Molod), which had represented decedent’s husband prior to being discharged by him, is entitled to a legal fee of $60,342 pursuant to an agreement between its predecessor firm and the predecessor to the firm of Lerman & Katz (Lerman), which represented decedent’s sister, the plaintiff, in a fiduciary capacity, in the settled action. The agreement provided for Molod to receive 25% of the legal fee awarded to Lerman.
Lerman contends that Molod is not entitled to any portion of the fee under the following alternative theories: Molod failed to file a retainer statement with the Office of Court Administration until approximately six years after its services had been terminated; Molod did not perform any services on the wrong *231 fui death and personal injury actions; and Molod was discharged by its client prior to the commencement of the action. Molod indicated at a pretrial conference that it had rendered approximately 20 hours of legal services in this matter. Without prejudice to either parties’ position, they stipulated at the outset of the hearing that, in the event that the court determines that Molod is limited to receiving quantum meruit compensation instead of a percentage of Lerman’s fee, the quantum meruit value of Molod’s legal services, based upon its then hourly rate, is $2,500.
The court holds that the delay in filing the retainer statement does not bar the claim for legal fees and that Molod performed services for which it is entitled to be compensated from the fee awarded to Lerman. However, Molod’s discharge without cause by decedent’s husband prior to its performing all of the services envisioned under its contract with Lerman precludes it from receiving 25% of Lerman’s fee as provided in the contract. Instead its compensation is limited to a percentage of the fee set forth in the agreement, using the value of the services actually performed by Molod prior to its discharge as the numerator of the fraction and the total value of the services that Molod would have performed had it not been discharged as the denominator. Based upon this formula, the value of Molod’s service is fixed in the sum of $18,102.60, an amount equal to 30% of the 25% fee provided for in the contract.
Most of the facts are not in dispute. Representatives of the two law firms signed a January 18, 1989 letter agreement prepared by Molod which reads in part as follows:
"I have written to Edwin Ascencio, the husband of Brenda Abreu, advising him that I will be consulted in regard to the action of Brenda Abreu against the City of New York and that I will advise you [sic] office and will have input in connection with the decisions made in regard to this litigation. I have advised him as to the fee arrangements which have been made.
"For the purpose of memorializing the understanding and agreement subject to the approval of our client, your firm and Mr. Levine will retain 75% of the fee in connection with this matter and my firm will receive 25% of the fee in connection with this matter.”
Molod also wrote a letter to decedent’s husband on January 18, 1989 which reads in part as follows: "In view of the situation as it exists we have reached an agreement, subject to your approval, of course, that these attorneys will continue to repre *232 sent your wife in connection with the injuries sustained as a result of her accident and that my office will be consulted and will have input and advise the attorneys who will continue the law suit on behalf of your wife. These attorneys have further agreed that there will be a division of fees that might result from the continuing law suit and action against the City of New York wherein they will retain 75% and my office will receive 25% of the fee.”
Molod obviously wrote both of the above letters to avoid litigation between decedent’s husband and decedent’s sister over the appointment of a guardian for decedent so that an action might be instituted for the injuries she suffered when she was struck by a sanitation truck on July 17, 1988. Although decedent was rendered comatose from the date of the accident, she did not die from those injuries until November 21, 1989. Her presumptive distributees are her husband and infant children.
It appears that decedent’s husband and sister had originally agreed that Irving Levine should be retained as the attorney to handle the litigation. Levine referred decedent’s sister to Lerman and she retained Lerman on September 28, 1988. Decedent’s husband signed a retainer agreement with Molod on November 29, 1988, but this agreement was not filed with the Office of Court Administration until March 29, 1995. Molod explained that this delay was caused by law office failure in that the statement remained in the firm’s file instead of being mailed in a timely fashion. When the mistake was discovered, the statement was submitted with a request that it be filed nunc pro tune.
Shortly after Molod was retained, it advised Levine by letter that it had been retained by decedent’s husband and requested that they discuss an orderly exchange of the file. In December 1988 decedent’s sister, represented by Lerman, commenced a proceeding to be appointed decedent’s guardian so that she could commence an action on her behalf. The potential opposition to this application by decedent’s husband was resolved, at least temporarily, as set forth in the above letters.
Molod received a letter dated March 3, 1989 from another attorney indicating that decedent’s husband had retained his firm with regard to the guardianship application. After Lerman learned that Molod no longer represented decedent’s husband, by letter dated April 26, 1989 it advised Molod that it was returning the January 18, 1989 agreement between them and was assuming that Molod was no longer involved in the *233 matter in any way. Moled ultimately responded that no purpose would be served by sending self-serving letters back and forth. In any event, Molod concedes that it performed no services for either decedent’s husband or the Lerman firm after the March 3, 1989 discharge letter. Prior to Molod’s discharge and in addition to the services rendered in the guardianship proceeding, it had obtained a police report and had had discussions with Lerman and decedent’s husband about a General Municipal Law § 50-h hearing.
After decedent’s husband retained new counsel, he apparently commenced a proceeding requesting that he replace his wife’s sister as her guardian. However, this application also appears to have been settled without a hearing and decedent’s sister remained as her fiduciary. A personal injury action was commenced on decedent’s behalf in April 1989. Decedent’s sister was appointed the administratrix of decedent’s estate after her death and continued the litigation in that capacity. The matter was tried for a period of two weeks during the summer of 1994 before it was settled. By the time of the trial, the whereabouts of decedent’s husband were unknown and, consequently, his claim for loss of services was dismissed without prejudice.
Lerman relies upon Rabinowitz v Cousins (219 AD2d 487) in support of its contention that the timely filing of a retainer statement with the Office of Court Administration, as required by 22 NYCRR 603.7(a), is a prerequisite to recovering any fee in a personal injury or wrongful death action. This Appellate Division rule requires attorneys who are retained on a contingency basis in negligence or the other types of actions set forth in the rule to file a retainer statement with the Office of Court Administration within 30 days of the date of any such retainer or within 15 days if retained by another attorney on a contingency basis. In Rabinowitz, the Court noted that the plaintiff, who was seeking a substantial recovery from the defendant who had replaced him as counsel, had been suspended from practice for unrelated professional activity, that his participation in the medical malpractice action was limited to appearing before the medical malpractice panel, and that plaintiff had rejected the tender of a $5,000 payment by the defendant who had prosecuted the case to verdict. It further appeared that the plaintiff never filed a retainer statement. Based upon this fact pattern, the Court granted summary judgment in favor of the defendant and dismissed the complaint on the grounds that plaintiff had not filed a retainer statement as *234 required by the rule which was promulgated to protect the public through the monitoring of fees.
The Rabinowitz case (supra) clearly warns the profession that the failure to comply with the retainer statement filing requirements can result in the forfeiture of the right to any compensation for legal services rendered. However, it appears that the Rabinowitz Court did not hold that an attorney forfeits the right to any compensation for services rendered merely because the retainer statement was filed one day late. Considering that the court has discretion under CPLR 2004 "[e]xcept where otherwise prescribed by law * * * [to] extend the time fixed by any * * * rule * * * upon such terms as may be just and upon good cause shown, whether the application for extension is made before or after the expiration of the time fixed”, it does not appear reasonable to interpret Rabinowitz as holding that the time period for filing the retainer statement may not be extended for good cause shown. Moreover, CPLR 2005 provides that law office failure may be a justifiable excuse for delay in an appropriate case. Lastly, inasmuch as it appears that a period well in excess of 30 days elapsed from the date that Lerman was retained to the date that it filed its retainer statement (Lerman was retained in September 1988 and the registration number it provided to the court reflects that the statement was filed in 1989), it is also fortunate for this firm that the retainer statement filing requirements are not interpreted as creating a rigid Statute of Limitations.
This case is distinguishable from Rabinowitz v Cousins (supra) in that Molod has not been suspended from practicing law, it filed a retainer statement prior to the hearing date of its claim for a fee, and it has established a justifiable excuse for the failure to timely file. Specifically, there is not the slightest indication that Molod failed to timely file the retainer statement for any reason other than that it was inadvertently placed in its litigation file instead of being mailed. The short period that Molod was retained explains both why the file was not looked at for years and why the mistake was not discovered until the instant fee dispute arose. Consequently, and without subscribing to Molod’s theory that the acceptance of the late filing by the Office of Court Administration constituted a considered administrative determination that the statement could be filed nunc pro tune, the court finds that Molod established a reasonable excuse for its late filing so that this fact, standing alone, does not preclude it from receiving compensation for services rendered.
*235 Molod’s services with regard to the police report, the General Municipal Law 50-h hearing, and the guardianship proceeding entitles it to compensation. Whether Molod is entitled to be compensated pursuant to its contract with Lerman depends not only upon the rights of attorneys who have been discharged without cause but also upon whether it was able to continue to perform services for Lerman pursuant to the contract after it had been discharged by decedent’s husband. Based upon the belief that clients should have complete confidence in their attorneys, "public policy recognizes a client’s right to terminate the attorney-client relationship at any time with or without cause” (Matter of Cooperman, 83 NY2d 465, 472, citing Matter of Dunn, 205 NY 398, 402; Tenney v Berger, 93 NY 524; Martin v Camp, 219 NY 170). Furthermore, as a general rule, where attorneys have been discharged without cause they may recover quantum meruit compensation "from the client * * * whether that be more or less than the amount provided in the contract or retainer agreement” (Lai Ling Cheng v Modansky Leasing Co., 73 NY2d 454, 457-458, citing Matter of Montgomery, 272 NY 323, 326-327). However, where the dispute is only between attorneys, the discharged attorney, who was retained on a contingency basis, has the option to receive either a fixed dollar amount on a quantum meruit basis or a contingent fee based on the share of the work performed by discharged counsel in relation to the share required to conclude the matter, which percentage may be fixed at either the time of substitution or, preferably, at the conclusion of the case, by which time all of the relevant factors to be considered can be ascertained instead of estimated (Lai Ling Cheng v Modansky Leasing Co., supra, 73 NY2d, at 458). Furthermore, fee-sharing arrangements between attorneys were sanctioned in the following language in Benjamin v Koeppel (85 NY2d 549, 556): "In closing, we also note our rejection of defendants’ contention that the fee-sharing agreement plaintiff seeks to enforce is invalid as a matter of professional ethics (see, Code of Professional Responsibility DR 2-107). It has long been understood that in disputes among attorneys over the enforcement of fee-sharing agreements the courts will not inquire into the precise worth of the services performed by the parties as long as each party actually contributed to the legal work and there is no claim that either 'refused to contribute more substantially’ (Sterling v Miller, 2 AD2d 900, affd 3 NY2d 778; see, Witt v Cohen, 192 AD2d 528; Oberman v Reilly, 66 AD2d 686; Rozales v Pegalis & Wachsman, 127 AD2d 577; *236 Jontow v Jontow, 34 AD2d 744, 745; Fried v Cahn, 239 App Div 213; Carter v Katz, Shandell, Katz & Erasmous, 120 Misc 2d 1009, 1018-1019; see also, Stissi v Interstate & Ocean Transp. Co., 814 F2d 848, 852).”
Although each firm appears to have respected the other, it would be naive to conclude that either firm entered into the fee arrangement due to the expertise of the other. Lerman agreed to split the fee with Molod to insure that it would be retained as the counsel to prosecute the action. Molod agreed to this arrangement not only because a portion of the pie was better than an empty plate but also because the arrangement placed it in a position to protect decedent’s husband’s interests in the litigation and to keep him apprised as the litigation progressed. The agreement between the firms as well as Molod’s letter to his client of the same date clearly reflects that the consideration that Molod was to furnish under the agreement was to "supervise” or to have "input” in the litigation on behalf of decedent’s husband and to assist in obtaining his "cooperation” in the litigation. After it was discharged, Molod was no longer able to fulfill its contractual obligations to Lerman or to perform any services for decedent’s husband. It would have been pointless for Lerman to have sought Molod’s "input” on behalf of decedent’s husband once he had declared he no longer wanted Molod to represent him. Moreover, Molod was no longer able to either assist in obtaining decedent’s husband’s assistance in the litigation or to insure that he would not seek to remove Lerman’s client as decedent’s guardian. The proof of this is that the whereabouts of decedent’s husband was no longer known at the time of the trial and that prior to his disappearance he had initiated what might be classified as a skirmish to remove decedent’s sister as the fiduciary.
Although Molod’s inability, after its discharge, to continue to perform the services that Lerman had bargained for in exchange for its promise to share 25% of the fee does not bar Molod from compensation for services rendered, its inability to perform additional services had the same effect upon Lerman as if Molod had "refused” to provide additional services. Since the refusal by counsel to perform additional services bars receiving the full compensation agreed to in the fee-sharing arrangement (Benjamin v Koeppel, supra), the result should be the same where there is an inability to perform the services. Nevertheless, inasmuch as Molod’s fee arrangement was on a contingency basis with another attorney and inasmuch as it *237 did not seek to have its compensation fixed at the time that it was discharged by decedent’s husband, it is now entitled to have its fee based on a percentage of the recovery (Lai Ling Cheng v Modansky Leasing Co., supra, 73 NY2d, at 459).
Under usual circumstances, the method used to fix the fee of replaced counsel is to compare the value of the services rendered by replaced counsel with the value of the services rendered by counsel who obtained the recovery and then to split 100% of the fee between them. A different method must be employed in this case because Molod was only to receive 25% of Lerman’s one-third contingency fee and because, after Molod was discharged, no other attorney made a claim for a portion of the 25% of the fee that would have been paid to Molod had it been able to continue to perform the services that were needed after its discharge by decedent’s husband. Although decedent’s husband did retain another firm after he had discharged Molod, Lerman represented that this firm was not paid any portion of its fee. The court makes no pretense that it can determine with anything close to the precision of a mathematical formula the additional services that Lerman would have called upon Molod to perform if it had not been discharged by decedent’s husband. However, it is no more difficult to ascertain this than it is to ascertain the percentage of the fee that removed counsel is entitled to receive when this calculation is made at the time of discharge (Lai Ling Cheng v Modansky Leasing Co., supra). Moreover, the alternative of limiting Molod to the hourly value of the legal services that it rendered does not appear just considering that Lerman should have known before it entered into the fee-sharing arrangement that Molod’s compensation under the agreement would greatly exceed its usual hourly compensation and that Molod’s misfortune of having been discharged without cause can be viewed as a windfall to Lerman to the extent that it does not have to give up the full 25% of its fee as it had agreed. When Lerman was anxious to be trial counsel, it voluntarily agreed to give a percentage of the fee to both Levine and Molod with full knowledge that, in all likelihood, it would perform most of the work while it would not receive the lion’s share of the fee under the fee-sharing arrangements. Lerman’s contention that it would be unethical to award a portion of its fee to Molod was answered in Benjamin v Koeppel (supra, 85 NY2d, at 556), wherein it is stated that "it ill becomes defendants, who are also bound by the Code of Professional Responsibility, to seek to avoid on 'ethical’ grounds the obligations of an agreement to *238 which they freely assented and from which they reaped the benefits”.
In calculating the numerator of the fraction of the fee that is to be paid to Molod, consideration has been given not only to the actual services rendered in the guardianship proceeding, in obtaining the police report and in connection with the General Municipal Law 50-h hearing but also to the fact that Lerman obtained the most important thing that it bargained for in the fee-sharing arrangement, it got the case. In calculating the denominator of the fraction, consideration has been given not only to the services that Molod would have had to render in preparing decedent’s husband’s depositions and his testimony at the trial which lasted for two weeks but also to the potentially larger recovery that might have been obtained in both the causes of action for decedent’s wrongful death and personal injuries and decedent’s husband’s action for loss of services if he had not discharged Molod and had testified at the trial. Lastly, decedent’s husband’s commencement of a proceeding to remove Lerman’s client as the fiduciary cannot be ignored. Based upon all of the above, the compensation of Molod is fixed in a percentage equal to 30% of the fee that it would have earned had it not been discharged. Accordingly, the objections are sustained to the extent that Lerman shall pay the sum of $18,102.60 to Molod from the legal fees that it is holding in escrow.