(April 8, 2008)

■ Steven B. Samuel, Esq., et al., Respondents-Appellants, v Druckman & Sinel, LLP, et al., Appellants-Respondents. [855 NYS2d 90]—

Order, Supreme Court, New York County (Debra A. James, J.), entered April 4, 2007, which denied defendants' motion and plaintiffs' cross motion for summary judgment as well as plaintiffs' effort to have the matter referred to the judge who had approved the compromise settlement for award of legal fees in the underlying medical malpractice case modified, on the law, defendants' motion for summary judgment on its first counterclaim granted to the extent it seeks one third of the $805,767.30 legal fee awarded under Judiciary Law § 474-a (2) in the underlying medical malpractice action, plaintiffs' cross motion for summary judgment declaring the rights of the parties granted to the same extent and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendant Druckman & Sinel and against plaintiff Samuel & Ott in the principal amount of $268,589, with statutory interest from April 7, 2007.

Following settlement of a medical malpractice action for $6.7 million in May 2005, the trial court issued an infant's compromise order directing the defendant therein to pay legal fees (including disbursements) of $1,137,826.41 to the plaintiff's law firm (Samuel & Ott) and $762,173.59 to cocounsel Pegalis & Erickson. This was greater than the $805,767.30 to which Samuel & Ott would have been entitled under the statutory sliding scale. Attorney Samuel justified the enhanced fee by pointing out that his firm was required to pay out of its portion both the Pegalis firm, which had joined in performing extraordinary services, as well as Sinel, the referring attorney, and that if limited to the fee under the statutory sliding scale, his and the Pegalis firms would not be adequately compensated for the thousands of hours expended in developing and trying this complex case. Attorney Pegalis offered his own statement citing his expert contribution to the successful settlement of the case, which involved brain injury suffered by an infant in the course of childbirth.

When Sinel insisted on one third of the entire enhanced amount awarded to Samuel and Pegalis, Samuel commenced the instant action, alleging that *any* award to Sinel's firm would be prohibited under Code of Professional Responsibility DR 2-107 (22 NYCRR 1200.12) and requesting that the court declare the

parties' respective rights. Sinel counterclaimed for $588,832.08, which was approximately one third of the combined, enhanced fees awarded to the Samuel and Pegalis firms, net of disbursements, plus $3,000 in disbursements. Plaintiffs cross-moved for an order declaring that Sinel and his firm were not entitled to any portion of the legal fee awarded. The motion court denied the parties' respective motions on the ground that the papers submitted were inadequate. We find that the record permits, and indeed requires, summary resolution of this dispute on the merits (*State of New York v Metz*, 241 AD2d 192, 196-202 [1998]).

Contrary to plaintiffs' contention, Sinel demonstrated that he "actually contributed to the legal work" through initial investigation, and there is no claim that he ever refused a request to contribute more substantially (*Benjamin v Koeppel*, 85 NY2d 549, 556 [1995]). Further, by disclosing to the client in writing that he was bringing in Samuel & Ott as trial counsel to handle the bulk of the work, and that no additional fee would be charged to the client as a result, Sinel demonstrated sufficient compliance with DR 2-107 (a). Consistent with the parties' fee-sharing and retainer agreements, the Sinel firm is thus entitled to its one-third share of the amount recovered by the Samuel firm under the statutory sliding scale applicable in malpractice cases, without regard to any arrangement made between the Samuel and Pegalis firms (*see Borgia v City of New York*, 259 AD2d 648 [1999]; *Gair, Gair & Conason v Stier*, 123 AD2d 556 [1986], *lv denied* 69 NY2d 606 [1987]).

However, Sinel made no contribution to the extraordinary services provided by Samuel and Pegalis that resulted in the trial court granting their application for an enhanced award of legal fees over the normal sliding scale. Under the circumstances, allowing Sinel to share in any portion of the enhanced award would result in a fee grossly disproportionate to the services rendered. It would result in defendants, the referring attorneys, being awarded a fee larger than plaintiffs, the attorneys who did the bulk of the work. Clearly, this could not have been the intent of the attorneys when they entered into their agreement nor can it be consistent with this Court's obligation to oversee the reasonableness of legal fees (*see Dugan v Dorff Constr. Co.*, 281 AD2d 158 [2001], *lv denied* 98 NY2d 606 [2002]; Code of Professional Responsibility DR 2-106 [22 NYCRR 1200.11]).* Concur—Lippman, P.J., Mazzarelli and Sweeny, JJ.

Gonzalez and McGuire, JJ., dissent in a memorandum by Mc-

---

* The dissent's concern that by this decision we are encouraging further litigation is misplaced. None of the cases cited by the dissent, and in fact, none

Guire, J., as follows: I agree with the majority that, for the reasons it states, Supreme Court erred in not deciding the motion and cross motion and that defendant Sinel's law firm is entitled to a share of the $1.9 million legal fee awarded in the medical malpractice action. I also agree that the right of Sinel's law firm to a share of the fee is not affected by the arrangement made between plaintiff Samuel's law firm and the Pegalis law firm (*see Borgia v City of New York,* 259 AD2d 648 [1999]). I respectfully disagree with the majority's determination not to enforce as written the agreement between Sinel's law firm and Samuel's law firm providing that the former "will be compensated at the rate of one-third of the entire legal fee recovered for our participation in this matter, upon its conclusion by settlement, verdict or otherwise." In effectively rewriting the agreement, the majority contradicts controlling and well-settled precedent dealing with such fee agreements and with contract law generally. Moreover, the majority establishes a precedent that will encourage—and enmesh the judiciary in—needless and standardless litigation.

What the Court of Appeals stated in *Benjamin v Koeppel* (85 NY2d 549, 556 [1995]) applies with equal force in this case. There, a law firm sought to avoid its contractual obligation to pay to an attorney who referred work to the firm one third of any fees the firm earned on the ground that the attorney had not complied with mandatory registration requirements. After holding that precluding the attorney from recovering on his contract was "wholly out of proportion to the requirements of public policy" (*id.* at 556 [internal quotation marks omitted]), the Court went on to state as follows: "In closing, we also note our rejection of defendants' contention that the fee-sharing agreement plaintiff seeks to enforce is invalid as a matter of professional ethics (*see,* Code of Professional Responsibility DR 2-107). It has long been understood that in disputes among attorneys over the enforcement of fee-sharing agreements the courts will not inquire into the precise worth of the services performed by the parties as long as each party actually contributed to the legal work and there is no claim that either 'refused to contribute more substantially' (*Sterling v Miller,* 2 AD2d 900, *affd* 3 NY2d 778; *see, Witt v Cohen,* 192 AD2d 528; *Oberman v Reilly,* 66 AD2d 686; *Rozales v Pegalis & Wachsman,* 127 AD2d 577; *Jontow v Jontow,* 34 AD2d 744, 745; *Fried v Cahn,* 239 App Div 213; *Carter v Katz, Shandell, Katz & Erasmous,* 120 Misc 2d 1009, 1018-1019; *see also, Stissi v Inter-*

of the authorities those cases relied on, dealt with anything other than the usual statutory awards.

*state & Ocean Transp. Co.*, 814 F2d 848, 852). Moreover, it ill becomes defendants, who are also bound by the Code of Professional Responsibility, to seek to avoid on 'ethical' grounds the obligations of an agreement to which they freely assented and from which they reaped the benefits (ABA Comm on Professional Ethics, Informal Opn No. 870)." (*Id.*) This Court has repeatedly followed that "well[-]settled" rule (*see e.g. Stinnett v Sears Roebuck & Co.*, 201 AD2d 362 [1994]; *Gore v Kressner*, 157 AD2d 575 [1990], *lv denied* 76 NY2d 701 [1990]). So, too, have the other Departments (*see e.g. Reich v Wolf & Fuhrman, P.C.*, 36 AD3d 885 [2d Dept 2007], *lv denied* 9 NY3d 812 [2007]; *Matter of Cohen Swados Wright Hanifin Bradford & Brett v Frank R. Bayger, P.C.*, 269 AD2d 739 [4th Dept 2000]).

The majority's approach also is contrary to first principles of contract law. "Freedom of contract prevails in an arm's length transaction between sophisticated parties . . . and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain" (*Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685, 695 [1995]; *see also Miller v Continental Ins. Co.*, 40 NY2d 675, 679 [1976] ["It is well to remember too that 'the right of private contract is no small part of the liberty of the citizen, and the usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare' "], quoting *Baltimore & Ohio Southwestern R. Co. v Voigt*, 176 US 498, 505 [1900]). Obviously enough, lawyers who practice in a specialized field like medical malpractice are sophisticated parties. When they enter into written agreements that govern their compensation, they do not become bumpkins. Yet, the majority does not permit freedom of contract to prevail.

Another fundamental precept of contract law is that in the absence of ambiguity, written agreements should be enforced according to their terms (*Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004] ["when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms"]). The relevant terms of this agreement ("one-third of the entire legal fee recovered for our participation in this matter, upon its conclusion by settlement, verdict or otherwise") are clear and unambiguous (*see Cohen Swados*, 269 AD2d at 741 ["The letter agreements between Cohen Swados and Bayger unambiguously provide that Cohen Swados is to receive 16% of any settlement

or verdict in the underlying action"]). Nonetheless, the majority does not enforce it according to its terms. To the extent that the majority believes that enforcing the agreement in accordance with its terms would be unfair to plaintiff Samuel's law firm, the majority also errs (*see Greenfield v Philles Records*, 98 NY2d 562, 570 [2002] ["a court is not free to alter the contract to reflect its personal notions of fairness and equity"]; *Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978] ["This court may not make or vary the contract . . . to accomplish its notions of abstract justice or moral obligation"]).

Similarly, the majority's approach is at odds with the principles that govern the interpretation of written contracts entered into between sophisticated parties negotiating at arm's length: "In such circumstances, courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. Hence, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Vermont Teddy Bear Co.*, 1 NY3d at 475 [internal quotation marks and citations omitted]). The majority errs by reading into the written, fee-sharing agreement a term that is not in the agreement. The agreement specifies that plaintiff Samuel's law firm "will be compensated at the rate of one-third of the entire legal fee recovered," not that the firm "will be compensated at the rate of one-third of the entire legal fee recovered other than any portion thereof reflecting an enhanced award for extraordinary services provided by it or by any other attorneys it may engage."

The majority also errs in expressly relying on the belief that enforcing the agreement as written (or, to put it as the majority does, "allowing Sinel to share in any portion of the enhanced award") would result in a fee "grossly disproportionate to the services rendered." Whether the fee to Sinel would be disproportionate to the services rendered is irrelevant. The majority's error is apparent when one considers that the majority can come to this conclusion only after doing that which it has "long been understood" a court will not do: "inquire into the precise worth of the services performed . . . as long as each party actually contributed to the legal work and there is no claim that either refused to contribute more substantially" (*Benjamin v Koeppel*, 85 NY2d at 556 [internal quotation marks omitted]). The recent decision by the Second Department in *Robert P. Lynn, Jr., LLC v Purcell* (40 AD3d 729 [2007]) is right on point: "[DR 2-107 (a) (2) (22 NYCRR 1200.12 [a] [2])] thus allows an attorney, in a

situation involving joint representation by attorneys from different firms, to recover a fee *disproportionate to the value of the services provided* if the attorneys have assumed joint responsibility for the representation, the client has been advised in writing of the joint representation and the attorneys have agreed to the amount of the fee. 'In short, if lawyers in different firms have taken joint responsibility and have given the client a writing to that effect, then they may divide the fees in any way they wish as long as the total fee is reasonable' (Simon, New York Code of Professional Responsibility Annotated at 341 [2006 ed])" (40 AD3d at 730-731 [emphasis added]).

The majority notes that enforcing the agreement as written "would result in defendants, the referring attorneys, being awarded a fee larger than plaintiffs, the attorneys who did the bulk of the work." According to the majority, this "[c]learly . . . could not have been the intent of the attorneys when they entered into their agreement nor can it be consistent with this Court's obligation to oversee the reasonableness of legal fees." First of all, however, nothing in the agreement itself supports this conclusion about the parties' intent, and this conclusion is inconsistent with another basic precept of contract interpretation (*see Slamow v Del Col*, 79 NY2d 1016, 1018 [1992] ["The best evidence of what parties to a written agreement intend is what they say in their writing"]). Second, without the referral made by defendants, plaintiffs would not have had *any* work to do on the malpractice action. The majority's conclusion about the parties' ostensibly "clear" intent rests in part on an implicit appraisal by the majority of the relative unimportance to the sophisticated attorneys who practice in the medical malpractice field of getting as compared to working on cases. The majority's conclusion falls apart once it is recognized that at least some practitioners may have a different view. As discussed below, moreover, judges do not have any special competence to make this or any of the related evaluations that inform the decisions of attorneys who enter into fee-sharing agreements. Third, the judiciary's "obligation to oversee the reasonableness of legal fees" is irrelevant. Regardless of how this dispute between the attorneys about how the fee should be shared is resolved, the fee paid by the client will not change. Finally, the judiciary has another responsibility that is relevant here: not to permit attorneys "to seek to avoid on 'ethical' grounds the obligations of an agreement to which they freely assented and from which they reaped the benefits" (*Benjamin*, 85 NY2d at 556).

The lone case the majority cites in support of its position, *Dugan v Dorff Constr. Co.* (281 AD2d 158 [2001], *lv denied* 98

NY2d 606 [2002]), is distinguishable. There, firm A, which originally handled the underlying personal injury action, retained firm B and the two firms entered into a fee-sharing agreement pursuant to which firm B was to receive two thirds of the fee ultimately received. Firm B, however, was discharged shortly after it was retained "after having performed minimal preliminary work on the case" (281 AD2d at 159), and the case was transferred back to firm A. Thereafter, firm B sought to recover two thirds of the fee received by firm A. In the course of refusing to uphold firm B's claim under the agreement, this Court adverted to its "inherent power to ensure that a fee charged by a firm be commensurate with the reasonable services rendered to a client" (*id.*). There, as in this case, however, the amount of the fee paid by the client was not affected by the dispute between the attorneys. In refusing to uphold firm B's contract claim, moreover, this Court did not write a new agreement for the parties. Rather, it essentially invalidated the contract and left firm B with a quantum meruit claim (*id.* ["we limit . . . firm (B) to a pro rata recovery of the value of the work it actually performed"]). And this Court did so because the agreement "clearly contemplated that . . . firm [B] would try the case to completion, not that the litigation would be returned to [firm A] after less than a month" (*id.*). Thus, *Dugan* should be viewed as a mutual mistake of fact case (*see Matter of Gould v Board of Educ. of Sewanhaka Cent. High School Dist.*, 81 NY2d 446, 453 [1993]), not as an anomaly or trail-blazing precedent.

The precedent the majority establishes, however, will take attorneys and courts down an unfortunate path. The litigation the majority encourages will be needless because the sophisticated parties who are the subject of the majority's solicitude are fully capable of protecting themselves. The litigation the majority encourages will be standardless because each case will turn on nothing other than an ad hoc judgment as to whether, all things considered, a judge regards the particular fee to be "too much." The competence of judges to make these judgments— given that the attorneys who enter into fee-sharing agreements consider a slew of variables, including their particular economic circumstances at the time, tolerance for risk and appraisal of the likelihood of success—is at least questionable. Perhaps some benefits may be obtained from time to time when fee-sharing agreements are judicially modified in a quest to satisfy the nebulous goal of ensuring that each attorney's share is sufficiently proportionate to the services rendered. But there will be countervailing costs. The litigation costs that will be incurred as fee-sharing agreements are attacked on the basis of subse-

---


quent events may be substantial. The majority's decision certainly creates powerful incentives for attorneys to cry foul. Whatever the precise extent of the unnecessary litigation costs, the majority's decision introduces a measure of uncertainty into many if not all fee-sharing agreements.*

One of the virtues of the "long[-]understood" rule acknowledged and approved in *Benjamin v Koeppel* is that it implicitly recognizes that courts are not well suited to make the kind of judgments that the majority's approach requires. As this Court recently stated in a similar context, "[t]hat the terms of an agreement may strike a court as unfair may reflect only an inadequate or incomplete appreciation of the complexities or commercial realities of a transaction" (*RM 14 FK Corp. v Bank One Trust Co., N.A.*, 37 AD3d 272, 274 [2007]). In this regard, I note that the majority directs that Sinel's law firm receive a fee that is almost $100,000 less than the amount offered by plaintiff Samuel (one third of the amount of his firm's fee rather than the entire fee received) after the malpractice action settled.

For these reasons, I would enforce the agreement as written and grant defendants' motion for summary judgment.

---

* The majority seeks both to distinguish all the cases that are at odds with its position and to limit the precedent it sets by arguing that none of the cases "dealt with anything other than the usual statutory awards." Even assuming that to be so, the rationale of those decisions (*see e.g. Benjamin v Koeppel, supra*) cannot be confined to cases involving only "the usual statutory awards." Similarly, the rationale offered by the majority—the ostensible need to prevent a fee the majority regards as "grossly disproportionate to the services rendered"—cannot be confined to cases involving only enhanced awards.