[933 NYS2d 694]

VILLAGE TAXI CORP. et al., Appellants, v RAMON BELTRE et al.,
Respondents.

Second Department, November 22, 2011

## APPEARANCES OF COUNSEL

*Danzig Fishman & Decea*, White Plains (*Yenisey Rodriguez-McCloskey* of counsel), for appellants.

*Michael F. Keesee*, Port Chester, for Ramon Beltre and another, respondents.

*Vouté, Lohrfink, Magro & Collins, LLP*, White Plains (*Ralph F. Schoene* of counsel), for Carlos Pereyra and another, respondents.

## OPINION OF THE COURT

Leventhal, J.

A contract that violates municipal regulations which exist for the protection of public health or morals may be illegal and unenforceable (*see Benjamin v Koeppel*, 85 NY2d 549, 553 [1995]). On this appeal, which arises from the sale of the outstanding capital stock and assets of certain taxi companies located within the Village of Port Chester, we consider, among other things, whether the Supreme Court correctly determined that so much of the subject contract as pertains to the sale of certain taxicab licenses is unenforceable and against public policy, mandating the summary dismissal of the fraud and breach of contract causes of action relating to those licenses. We answer this question in the affirmative.

Pursuant to a written agreement dated March 11, 2005 (hereinafter the agreement), the plaintiff Pedro Montoya and his wife, the plaintiff Yodna Vivanco-Small (hereinafter together the Buyers), purchased from the defendants Ramon Beltre and Janeth Campos (hereinafter together the Sellers) all of the outstanding capital stock and assets of two taxi companies, the plaintiffs Village Taxi Corp. (hereinafter Village Taxi) and Port Chester Taxi Corp. (hereinafter PC Taxi) for the sum of $300,000. The purchase price specifically includes goodwill, a

covenant not to compete, equipment, and a leasehold. The agreement makes no references to any licenses.

As pertinent here, article III of the agreement, entitled "Representations and Warranties," provides that the Sellers would convey good and marketable title to the taxi companies, and that the nine motor vehicles included in the transaction would pass inspection. The agreement adds that "[t]his instrument represents the entire agreement between Sellers and Purchasers and shall be binding upon them," and that it "shall not be modified or terminated except in accordance with its terms, other than by an instrument in writing signed by both parties."

In September 2006, an addendum to the agreement was executed which states:

> "The nine motor vehicles and the nine taxi licenses issue[d] by the Village of Port Chester is including [sic] in the transaction as part of the equipment sold by [the Sellers] to [the Buyers] during the sell [sic] and purchases of [Village Taxi and PC Taxi]. The purpose of this Agreement is to ratify the transfer of the nine cars and the nine licenses."

The addendum lists the nine motor vehicles, as well as the licenses issued by the Village of Port Chester that were associated with each vehicle. Only Beltre signed the addendum.

In July 2007, the Buyers, Village Taxi, and PC Taxi (hereinafter collectively the plaintiffs), commenced this action against the Sellers, Carlos Pereyra, Leonardo Coronado, the estate of Anthony Silvano (hereinafter the Estate), and Luso Taxi. Carlos Pereyra and Leonardo Coronado (hereinafter together the Drivers), as well as Anthony Silvano (now deceased), were taxicab drivers who previously worked for Village Taxi and PC Taxi when those companies were owned by the Sellers. The Drivers had continued to work for Village Taxi and PC Taxi for some time after they were sold to the Buyers. The defendant Luso Taxi is a Port Chester taxicab company and is the Drivers' current employer.

In their first cause of action seeking to recover damages for, in effect, fraudulent inducement against the Sellers, the plaintiffs alleged that the Sellers represented that the assets of Village Taxi and PC Taxi consisted of nine individual taxicab licenses which were issued by the Village "to operate vehicles for hire to carry persons pursuant to the Village of Port Chester

Code." The plaintiffs alleged that the Sellers represented that those assets were "free and clear of any and all claims, liens, or encumbrances." The plaintiffs asserted that "[p]ursuant to the custom and practice within the Village of Port Chester, taxicab licenses were issued to individual drivers, and [Village Taxi and PC Taxi] were the beneficial owners of the licenses," and the Sellers represented as much. Specifically, the plaintiffs alleged that "during the entire course of . . . negotiations," the Sellers "wilfully and intentionally made [knowingly false] misrepresentations" to the Buyers regarding the status of the taxicab licenses to induce the Buyers to enter into the agreement, which the Buyers relied upon. The Buyers later learned that the "licenses were not properly held by [Village Taxi and PC Taxi]" and alleged that they have been forced to expend considerable sums "in order to establish and defend their rights to the licenses." According to the plaintiffs, the Buyers "would not have entered into the agreement to purchase the stock . . . had they known that licenses were not in fact owned by [Village Taxi and PC Taxi]."

The second cause of action sought to recover damages for an unspecified breach of contract against the Sellers.[1] The fourth cause of action sought to recover damages for breach of contract against the Drivers. The plaintiffs alleged that they were the "beneficial owners of the licenses and automobiles, currently in the name of [the Drivers], license numbers 12 and 38." The plaintiffs further claimed that "as a condition of their being granted permission to drive," the Drivers "agreed to work under the auspices and for the benefit of [Village Taxi and PC Taxi]." The Drivers allegedly breached that agreement in that they no longer drive for Village Taxi and PC Taxi.

In the sixth cause of action, the plaintiffs alleged, inter alia, that the Drivers exercised dominion and control over license

---

**1.** In the third cause of action seeking to recover damages for tortious interference, the plaintiffs alleged that Luso Taxi lured Pereyra and Coronado away from Village Taxi and PC Taxi. The fifth cause of action was against the Estate, alleging that the plaintiffs were the beneficial owners of Silvano's taxi license and automobile, that Silvano had agreed to work for Village Taxi and PC Taxi's benefit, that the Estate had "attempted to transfer said licensed [sic] in violation and to the detriment of the agreement to drive for the benefit of the plaintiffs," and that the Estate "has breached their [sic] agreement in that they [sic] no longer drive for the Plaintiffs." The sixth and seventh causes of action also sought to recover damages from, among others, the Estate. The plaintiffs have not appealed from those portions of the order and judgment which dismissed the causes of action asserted against Luso Taxi and the Estate and, thus, those portions of the order and judgment are not addressed on appeal.

Nos. 12 and 38, and the automobiles used in connection with those licenses. Accordingly, the plaintiffs sought to recover those licences and vehicles. Lastly, in the seventh cause of action, the plaintiffs stated, inter alia, that the action of the Drivers constituted "an unjust enrichment."

At her examination before trial, Vivanco-Small testified that she was familiar with the way the taxi companies did business in the Village of Port Chester. She testified that the industry standard or custom was not to put all the cars in the name of the corporation. Rather, Vivanco-Small acknowledged, it was her understanding that the taxicabs would be registered "in the name of individuals." Vivanco-Small added,

> "I was informed [prior to purchasing Village Taxi and PC Taxi] that the Village of Port Chester requests the [taxicab] license to be under the person or the corporation which the insurance was. Meaning, insurance was issued to the individuals and those license [sic] should be issued to those individuals, not the corporation. At that time, they were not insured for the corporation."

According to Vivanco-Small, it was "quite difficult" to obtain insurance for a taxi corporation. Vivanco-Small initially testified at her deposition that the Buyers did not receive three of nine taxicab licenses, license Nos. 12, 38, or 57, for which they bargained in the addendum to the agreement. However, she later clarified that the Buyers did receive all nine taxicab licenses at closing, and kept those licenses for one year.

When the Buyers received license No. 12 in 2005, the license was initially in the name of a driver named Amabella Valdiviezo; Coronado and Montoya subsequently agreed to put that license in Coronado's name, despite knowing that the license was not transferrable. Vivanco-Small admitted that license No. 12 included the phrase "this license is not transferable" on the bottom. Nevertheless, Vivanco-Small testified that people generally "chang[ed] those license[s] among drivers." Vivanco-Small testified "that it was only for the purpose to run the business, keep for us [the Buyers] to keep run the business [sic]." Vivanco-Small agreed that Coronado's name was placed on license No. 12, with the consent of the Buyers, in order "to be able to operate a taxi [sic]." Montoya testified that the Buyers put license No. 12 in Coronado's name, rather than in the name of Village Taxi, "[b]ecause the corporation['s] insurance had not been approved."

As to license No. 38, which was in Pereyra's name prior to the closing, the Buyers testified at their deposition that they and Pereyra had agreed that Pereyra would keep license No. 38 in Pereyra's name, but the plaintiffs would be the true owners of that license. Vivanco-Small testified that license No. 57 was in the name of a nonparty prior to the closing, but was subsequently transferred to Silvano's name. Vivanco-Small admitted that the Buyers agreed that license No. 57 would be placed in Silvano's name. According to Vivanco-Small, after Silvano died, his son "claimed he owned that license."

In April 2009, following discovery, the Drivers moved, inter alia, for summary judgment dismissing the complaint insofar as asserted against them. The Drivers contradicted the plaintiffs' contentions regarding license Nos. 12 and 38, and argued that they fully complied with the provisions of chapter 295 of the Port Chester Village Code, which addresses the Village's taxicab regulatory scheme.

Thereafter, the Sellers also moved for summary judgment dismissing the complaint insofar as asserted against them. The Sellers argued that the deposition testimony demonstrated that the Buyers knew at the time of the contract signing and closing that the taxi licenses were being held in the names of the respective license holders. The Sellers further asserted that the evidence demonstrated that the Buyers knew, at the time of the sale, that taxi licenses were held by those individuals.

In an order and judgment (one paper) dated August 3, 2009, the Supreme Court held that the Sellers and the Drivers established their prima facie entitlement to judgment as a matter of law dismissing the complaint insofar as asserted against them. The Supreme Court determined that while the Port Chester Village Code required the Buyers to apply for permission to transfer the subject taxi licenses, the Buyers conceded that they did not seek approval of any license transfer. The Supreme Court found that the defendants were "just as guilty [as the plaintiffs] in participating in this scheme," and that because the regulations at issue were established to protect public health and safety, the portion of the parties' addendum pertaining to the licenses was against public policy and therefore unenforceable. Moreover, the Supreme Court determined, it was "not disproportionate to decline to enforce the parties' agreement, especially since

Plaintiffs have already reaped benefits from their fraudulent action."[2]

On appeal, the plaintiffs contend that the agreement clearly and unambiguously provides that the Sellers would furnish the Buyers with good and marketable title to the nine taxicab licenses. Thus, the plaintiffs assert that, as to the Sellers' and the Drivers' respective motions, the Supreme Court should not have considered any extrinsic evidence with respect to whether the agreement required the Sellers to convey the nine taxicabs and the nine taxicab licenses. Further, the plaintiffs contend that triable issues of fact exist as to the causes of action, in effect, to recover damages for fraudulent inducement and breach of contract asserted against the Sellers.

## Discussion

The statutory scheme at issue is the Port Chester Village Code (hereinafter the Code) chapter 295. This chapter, entitled "Taxicabs," regulates the taxi industry (see Town Law § 136 [1] ["(t)he town board may provide by ordinance for the licensing and otherwise regulating of . . . cabs"]; see also General Obligations Law § 7-201 [explaining that the purchaser of a licensed taxicab must be approved by the licensing agency]). Specifically, section 295-11 (A) of the Code provides:

"It shall be unlawful for any person to own a motor vehicle to be operated as a taxicab upon the streets of the Village without first having obtained therefor a taxicab license under the provisions of this chapter from the office of the Village Clerk. Such license shall be issued as of July 1 and shall be valid to and including June 30 next succeeding, unless previously suspended or revoked. No license shall be issued unless said person and vehicle are affiliated with a dispatching company duly licensed under the provisions of this chapter. No license shall be issued to a person convicted of a felony."

A "taxicab operator" is defined as "[a]ny person who operates a taxicab, whether such person is the owner of such taxicab or registrant of such taxicab or employed to operate such taxicab" (Port Chester Village Code § 295-1). A "taxicab license" is defined as "[p]ermission granted to any person to own or register a vehicle for hire as a taxicab in [the] Village" (id.).

---

2. The court also, sua sponte, dismissed pursuant to CPLR 3215, the complaint insofar as asserted against Luso Taxi and the Estate, as abandoned.

Section 295-12 (A) of the Code provides that an "[a]pplication for a taxicab license shall be made by the owner," and specifies the information required on the application, including insurance information, any criminal history of the applicant, and a copy of the taxi operator's license. Section 295-13 of the Code discusses renewal of taxicab licenses, and notes that "transfers of the taxicab license shall be permitted and authorized upon the consent of the transferor/licensed vehicle owner provided that the transferee meets the license requirements of § 295-12" (Port Chester Village Code § 295-13 [D]). If a licensed vehicle is to be reregistered to another person or entity then such owner must provide a complete application containing the information required by the Code (see Port Chester Village Code § 295-13 [E]).

Code § 295-5 (B) explains that the Village's taxi commission "may request any Village licensee to appear before it for a hearing based upon any complaint against such licensee relative to the provisions of this chapter." The taxi commission has authority to suspend or revoke a license "or take such other action as it may deem proper" (Port Chester Village Code § 295-5 [B]). Moreover, under section 295-30 (A) of the Code, the owner of a taxicab not properly licensed in accordance with the Code who engages in the taxicab business "shall be punished by a fine of not more than $250 or by imprisonment not exceeding 30 days, or by both such fine and imprisonment." Code § 295-30 (C) similarly provides that "[u]pon conviction of any person for any violation of a provision of this chapter for which no punishment is specifically provided, the violation shall be punishable by a fine not exceeding $250 or by imprisonment not exceeding 30 days, or by both such fine and imprisonment."

"[P]arties should be free to chart their own contractual course" unless public policy is offended (*Welsbach Elec. Corp. v MasTec N. Am., Inc.*, 7 NY3d 624, 629 [2006]). However, illegal contracts are, as a general rule, unenforceable (*see e.g. Benjamin v Koeppel*, 85 NY2d 549, 553 [1995]; *Lloyd Capital Corp. v Pat Henchar, Inc.*, 80 NY2d 124, 127 [1992]; *Richards Conditioning Corp. v Oleet*, 21 NY2d 895, 896 [1968]; *Jara v Strong Steel Door, Inc.*, 58 AD3d 600, 602 [2009]). Although illegal contracts are generally unenforceable, in *Galbreath-Ruffin Corp. v 40th & 3rd Corp.* (19 NY2d 354, 364 [1967]), the Court of Appeals explained that where the statute or regulation requiring that a license be procured

> "is merely for the purpose of raising revenue it would seem that acts performed without securing a

license would be valid. But where the statute looks beyond the question of revenue and has for its purpose the protection of public health or morals or the prevention of fraud, a non-compliance with its terms would affect the legality of the business" (quoting *Silinsky v Lustig,* 118 Misc 298, 299 [1922]).

The Code, together with related regulations which are targeted at the taxicab industry, exists for the public's protection rather than for revenue-raising purposes (*see e.g. Bell v Perrino,* 112 AD2d 124, 125 [1985], *affd* 67 NY2d 751, 752 [1986] ["(o)rdinances . . . requiring the licensing of the taxicab industry . . . are enacted for the benefit of the general public"]; *see generally Burbach v City of New York,* 194 AD2d 391, 391-392 [1993] ["Ordinances requiring the licensing of the taxicab industry are enacted for the benefit of the general public, not for the benefit of a limited class of persons"]). The crux of the matter is that the agreement allowed for the conveyance of the taxicab licenses without the Village's involvement. The plaintiffs, for their part, maintain that the Sellers did not keep their end of the bargain. "[T]he courts are especially skeptical of efforts by clients or customers to use public policy 'as a sword for personal gain rather than a shield for the public good' " (*Benjamin v Koeppel,* 85 NY2d at 553, quoting *Charlebois v Weller Assoc.,* 72 NY2d 587, 595 [1988]). Nevertheless, the Code makes clear that the parties were not authorized to bypass the Code by making private arrangements that were contrary to the regulatory scheme. The evidence submitted on the respective motions demonstrates that the Buyers were undoubtedly aware of this fact. That portion of the agreement relating to the licenses contravenes the primary purpose of the Code provisions: that is, the safety of the public. In this regard, in addition to provisions relating to insurance coverage and the safety of the vehicles, the Code mandates that taxicab license holders submit to criminal background checks and have, among other things, proper taxi operator's licenses and liability insurance.

We find that the denial of relief to the plaintiffs is not disproportionate to the requirements of public policy. Although the Buyers paid the sum of $300,000 for Village Taxi and PC Taxi's assets, only $75,000 of that sum went for equipment, which, according to the 2006 addendum, consisted of both cars and licenses. Here, the plaintiffs received all nine taxicabs and at least six of the licenses and, consequently, the loss of license

Nos. 12, 38, and 57 would result in a minimal forfeiture. Indeed, we note that Vivanco-Small testified that the plaintiffs held all nine licenses for a year following the sale.

Construing the Code and the applicable public policy concerns, we conclude that the Supreme Court properly determined that the portion of the subject agreement which relates to the transfer of the licenses is unenforceable (*see e.g. Richards Conditioning Corp. v Oleet*, 21 NY2d at 896 [where purpose of a regulatory scheme was to protect the public's health and safety, the plaintiff was barred from recovering on an agreement to install the air conditioning system since the plaintiff lacked an installer's license]). The conduct at issue has a direct connection to the fraudulent inducement and breach of contract causes of action since it concerned the transfer of the licenses (*see e.g. FCI Group, Inc. v City of New York*, 54 AD3d 171, 177 [2008]). Consequently, the causes of action alleging, in effect, fraudulent inducement and breach of contract were properly dismissed (*see Sabia v Mattituck Inlet Mar. & Shipyard, Inc.*, 24 AD3d 178, 179 [2005] ["(t)he fraud claim based on the same transaction must also be dismissed, since relief cannot be granted on a tort cause of action that requires proof of the plaintiff's knowing entry into an illegal contract"]; *R.A.C. Group, Inc. v Board of Educ. of City of N.Y.*, 21 AD3d 243, 247-249 [2005] [deeming contract unenforceable even though the relevant statute did not state that violations would result in forfeiture of plaintiffs' right to recovery, statutory penalties for malfeasance were in place, and the defendant would receive a windfall, because precluding the plaintiffs' recovery under the contract was "consistent with . . . public policy"]; *Blum v Drucker*, 240 AD2d 609, 609-610 [1997] [although plaintiffs sought "enforcement of a contract to pay profit distributions calculated, in part, on referrals they and other doctors made to the appellants-respondents' practice," the agreement was illegal and unenforceable because "it violated Federal Medicare law . . . , was against public policy, and was proscribed by [federal] regulations"]).

We note that nearly all of the plaintiffs' arguments on appeal pertain to the Sellers. The plaintiffs' only contention that is relevant to the Drivers is the assertion that those defendants were not entitled to rely on certain deposition transcripts.[3] In this regard, the plaintiffs argue that the Supreme Court erroneously considered such extrinsic evidence in the form of the deposition

---

3. The plaintiffs' brief is devoid of references to replevin, unjust enrichment, or any alleged contracts between Village Taxi and the Drivers.

transcripts submitted by the Drivers and Sellers in support of their respective motions (*see e.g. Martinez v 123-16 Liberty Ave. Realty Corp.*, 47 AD3d 901, 902 [2008]; *Pina v Flik Intl. Corp.*, 25 AD3d 772, 773] [2006]). However, the plaintiffs never raised this issue before the Supreme Court. Consequently, this contention is not properly before this Court (*see Jones v Castro-Tinco*, 62 AD3d 957 [2009]; *Sher v Scott*, 203 AD2d 274 [1994]).

The plaintiffs' remaining contentions are without merit.

Accordingly, the order and judgment is affirmed insofar as appealed from.

FLORIO, J.P., HALL and AUSTIN, JJ., concur.

Ordered that the order and judgment is affirmed insofar as appealed from, with one bill of costs.