OPINION OF THE COURT
Carolyn E. Demarest, J.
In this action for breach of contract, breach of fiduciary duty, and tortious interference with contracts, among other claims, defendants Bendiner & Schlesinger, Inc. (B&S) and Conti and defendant Kobakhidze separately move for partial summary judgment, declaring certain agency agreements with plaintiff Quality Health Care Mgt. Inc., doing business as Quality Laboratory Service (Quality), void and unenforceable, and dismissing plaintiff’s first six causes of action against Conti and Kobakhidze.
Background
It is not disputed that Conti and Kobakhidze worked as salespeople and account managers for Quality, a medical testing facility, until some time in 2010 when they left and both began working for B&S, also a medical testing facility. While working for Quality, Conti and Kobakhidze signed agency agreements, containing confidentiality and non-solicitation provisions,[1] which are the basis for many of plaintiff’s claims, including *539 breach of contract. Conti’s agency agreement is dated November 11, 2009, and Kobakhidze’s is dated December 1, 2009.
After Conti and Kobakhidze began working for B&S, Quality began losing many of its customers to B&S. Quality alleges that while Conti and Kobakhidze were still working for Quality, B&S conspired with them to divert Quality’s customers. According to Quality, Conti and Kobakhidze used confidential information, such as client lists, to contact customers and recruit them for B&S, while also intentionally mismanaging customers accounts at Quality to give customers the impression that Quality was disorganized and incompetent to serve its clients.
Plaintiff initiated this action on November 4, 2010, and filed its first amended verified complaint on January 14, 2011. On March 1, 2012, plaintiff filed its second amended verified complaint alleging various causes of action for breach of contract for “illegal termination,” “illegal use of confidential information,” breach of the non-solicitation provision, breach of fiduciary duties, “tortious interference with plaintiff-customer relations,” and misappropriation of trade secrets against defendants Conti and Kobakhidze individually. Against B&S, plaintiff asserts causes of action for unjust enrichment, misappropriation of trade secrets, and “tortious interference with plaintiff-customer relations.” By notice of motion dated April 24, 2013, defendants Conti and B&S moved for partial summary judgment declaring the agreements void, and by notice of motion dated May 24, 2013, defendant Kobakhidze moved to dismiss the complaint on the basis that the contracts are illegal.
Discussion
Upon motion for summary judgment, the moving party has the initial burden to produce affidavits and documentary evidence sufficient to “warrant the court as a matter of law in directing judgment in [its] favor” (CPLR 3212 [b]; see Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067 [1979]). Once the movant establishes its prima facie entitlement to judgment, the burden shifts to the opposing parties to “demonstrate by admissible evidence the existence of a factual issue requiring a trial of the action” (Zuckerman v City of New York, 49 NY2d 557, 560 [1980]). While all “facts must be viewed ‘in the light most favorable to the non-moving party’ ” (Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012], quoting Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 339 [2011]), mere conclusory allega *540 tions or defenses are insufficient to preclude summary judgment (see Zuckerman, 49 NY2d at 562).
Defendants’ motions[2] are premised on the argument that defendants Conti and Kobakhidze are not bound by the confidentiality and non-solicitation provisions of the agency agreements, as those agreements are void and unenforceable because they, as independent contractors, not employees, received commissions for securing the referral of patients, in violation of Public Health Law § 587 and 42 USC § 1320a-7b (b). 42 USC § 1320a-7b (b) prohibits, among other acts, the solicitation or receipt of remuneration, in exchange for referring a person for a service for which payment is made in whole or part under a federal health care program. It is undisputed that defendants were hired to market plaintiffs services as a medical tester to providers, and there is no indication that they were in a position to themselves refer patients for such services. Accordingly, the federal statute is inapplicable.
Public Health Law § 587 (5), however, provides, in part, that
“[n]o clinical laboratory . . . shall make, offer, give or agree to make, offer or give to any person, partnership, corporation or other entity any payment or other consideration in any form as a bonus, commission or fee for securing referrals of services to the clinical laboratory except for payments made to a person who is an employee of the clinical laboratory.”
Public Health Law § 587 was enacted in 1992, repealing what was formerly article 38 of the General Business Law, though incorporating much of the same language. The legislative history of the bill (1992 NY Assembly Bill 7406-B) reveals that lawmakers were primarily concerned with preventing health care providers, such as physicians, from referring patients to labs when the provider was benefitting from such referral by receiving a kickback or other remuneration. The Governor’s Program Bill Memorandum, filed with the bill, indicates that its purpose was:
*541 “To prohibit referrals of patients by a health care practitioner to a health care provider for clinical laboratory services or x-ray or imaging services where such health care practitioner or immediate family member has a financial relationship with such health care provider and to conform state law with federal requirements prohibiting such referrals of Medicare patients to clinical laboratories. The bill also clarifies the law governing clinical laboratory business practices” (Governor’s Program Mem, Bill Jacket, L 1992, ch 803 at 6).
The Memorandum further explains that “[t]he Department has become aware of numerous incentives and schemes by laboratories to obtain referrals of physicians and other persons authorized by law to order tests,” such as cash, free testing, clerical personnel, and equipment, and “[bjecause the Health Department regulates all other practices of the clinical laboratory industry, it is in the best position to investigate these activities and take appropriate administrative or criminal action” {id. at 12). Pursuant to Public Health Law § 587 (6), the Department of Health has adopted various regulations pertaining to the statute. For example, 10 NYCRR 34-2.3 (a) prohibits health services purveyors[3] from soliciting consideration from a clinical laboratory for the referral of specimens. 10 NYCRR 34-2.4, titled “Prohibited business practices by clinical laboratories,” reiterates Public Health Law § 587’s prohibition against clinical laboratories offering consideration to a health services purveyor for the referral of specimens for lab services, as well as the prohibition against participating in the splitting of fees with any health services purveyor or clinical lab.
The regulations do not address Public Health Law § 587 (5). However, the Department of Health (DOH), on its website, *542 published a number of “Provider Manuals” referring specifically to Medicaid providers. Under New York State Medicaid Program, Laboratory Manual Policy Guidelines § V (“Unacceptable Practices”) at 26, the manual states, in part:
“[Laboratories are specifically prohibited from engaging in practices considered unacceptable including, but not limited to . . .
“Payment of a percentage commission to sales personnel who are not employees of the laboratory. This prohibition is applicable to all non-employees of a laboratory including:
“Independent contractors and management companies who may receive a fee for arranging or facilitating referral work to the laboratory” (https:// www.emedny.org/ProviderManuals/Laboratory/ PDFS/Laboratory-Policy_Section.pdf [accessed Sept. 10, 2013], cached at http://www.nycourts.gov/ reporter/webdocs/Laboratory-Policy_Section.pdf).
Thus, although Public Health Law § 587 (5)’s main purpose is to prevent the payment of kickbacks in exchange for patient referrals, the statute also prohibits the payment of commissions, by clinical labs, to non-employees for securing referrals of services.
Defendants maintain that they were independent contractors of Quality, not employees. While a contract designating a person as an independent contractor is a factor to be considered in determining whether one is an employee or independent contractor, it is not dispositive, and courts will look to the actual practices of the parties (see Araneo v Town Bd. for Town of Clarkstown, 55 AD3d 516 [2d Dept 2008]). Some of the other considerations in determining the actual status of an individual include whether the employer has the right to terminate without cause, the method of compensation, and whether the individual is paid on commission (see e.g. Matter of Electrolux Corp., 288 NY 440 [1942] [right of employer to terminate contract at any time, regardless of cause, is a factor in determining that individual is an employee]; Matter of Grigoli v Nito, 11 AD2d 581 [3d Dept 1960] [method of payment a factor to be considered]; Berger v Dykstra, 203 AD2d 754, 754 [3d Dept 1994] [that individual was paid in commissions was a factor in determining that he was an independent contractor]). However, the primary factor to consider is “the degree of control exercised by the purported employer over the results produced or the means used to achieve the results” (Wecker v Crossland Group, Inc., 92 *543 AD3d 870, 871 [2d Dept 2012], citing Araneo, 55 AD3d at 518-519).
Defendants offer evidence that would support a finding that they were not employees of plaintiff. For example, Conti asserts that Quality did not pay Social Security tax, disability or unemployment insurance for defendants, or withhold taxes from their compensation and argues that Quality has not produced a 1099 or W-2 form during the course of discovery. He claims that defendants received no benefits and did not have a desk, telephone number, or stationery relating to plaintiffs premises, nor did they have to report to work regularly. It is undisputed that eventually defendants formed corporations to receive commissions from Quality.
The terms of the agreement also support the contention that defendants were independent contractors. Under the agreement, plaintiff would compensate defendant on a commission basis for the sales of plaintiffs services that were originated by each defendant. Several provisions contemplate that defendants could hire subcontractors or subagents for whom plaintiff would not be liable, and section 3.14 (e) states that plaintiff would not reimburse defendants for any out-of-pocket expenses incurred by defendants in their marketing efforts. Section 3.3 (b) allows either side to terminate the agreement, on 30 days’ written notice, for breach of obligations under the agreement. Under the heading “Representation, Warranties and Agreements of Agent,” defendants expressly agreed that “Agent shall not represent itself as an employee, agent, or exclusive distributor of Quality,” and section 3.14 (a) provides, in part, that
“[t]he relationship of Quality and Agent under this Agreement is that of an independent contractor and such relationship shall continue throughout the term of this Agreement and any extension or renewal thereof. Nothing contained in this Agreement shall be construed to constitute either party as a[n] . . . employee ... of the other.”
Section 3.14 (a) also expressly limits plaintiffs control over defendants and reads, in part: “Quality shall have no control over Agent’s directors’ [sic], officers, employees or agents, including the terms and conditions of their employment, nor over Agent’s methods of doing business except as may be set forth herein.” The provisions in the agreement that do provide for Quality’s *544 control over defendants are related to the marketing and advertising materials used by defendants.[4]
In opposition to the motions, plaintiff contends that the statute was not violated because defendants were employees. In support of this position, plaintiff presents an affidavit from Greg Roman, Quality’s owner, in which he claims that Kobakhidze was receiving employment benefits and that Conti received a fixed salary.[5] Roman also asserts that the DOH performed a week-long, on-site investigation of Quality and determined that plaintiff did not violated Public Health Law § 587 (5) because it found Conti and Kobakhidze to be bona fide employees of plaintiff. As evidence of the DOH determination, plaintiff submits two letters from the DOH. The first, dated April 27, 2010, confirms that Quality was being investigated for alleged violations of Public Health Law § 587 (5) for “paying independent contractors on a commission basis for referral of physician clients to the laboratory.” The second letter, dated June 22, 2010, states in part that the DOH “appreciates Quality’s assembling a compliance package documenting the laboratory’s proposed and effectuated actions to ensure that each salesperson on its staff are actual employees” and that “[n]o enforcement actions will be taken based on this matter at this time.” Thus, it appears that the DOH made a determination that Quality did not violate Public Health Law § 587 (5), the very issue at hand.
However, the DOH determination is not dispositive, as it does not preclude a finding that defendants were independent contractors outside of the period of time Quality was investigated. The court notes that although plaintiff, in its complaint, *545 states that Conti left Quality in early October 2010, Conti claims that he left in February or March 2010 and began working at B&S in May 2010. The investigation by DOH, which occurred sometime between April 27 and June 22, 2010, may not have occurred during Conti’s time at Quality, if the court credits Conti’s version of the facts. Moreover, it is not disputed that Kobakhidze left Quality sometime in October 2010 — at least three months after the DOH’s determination — and that at least one corporation was formed to collect commissions paid to Kobakhidze. It is unclear when such corporation was receiving commissions, but it is possible that the status of the defendants visa-vis Quality shifted over time. Accordingly, issues of fact remain as to the relationships of Conti and Kobakhidze to Quality. At any rate, defendants have not met their burden to show the absence of a material factual dispute, and their motions seeking declaratory relief and dismissal of various causes of action are denied.
Moreover, even if the court were to find that the agency agreements violated Public Health Law § 587 (5), such a finding would not render the agreements unenforceable or preclude plaintiff from recovering under them.
Although “ ‘[fillegal contracts are, as a general rule, unenforceable’ ” (Benjamin v Koeppel, 85 NY2d 549, 553 [1995], quoting Lloyd Capital Corp. v Pat Henchar, Inc., 80 NY2d 124, 127 [1992]), “the violation of a statute that is merely malum prohibitum will not necessarily render a contract illegal and unenforceable” (id.). Acts malum prohibitum are those that are evil only because they are prohibited by statute, often to further public policy, in contrast to offenses malum in se, that are inherently evil, often involving moral turpitude (see People v Dozier, 72 AD2d 478, 485 [1st Dept 1980] [discussing crimes malum in se, requiring intent, and crimes malum prohibitum, prohibited by statutes enacted for the “achievement of some social betterment”]; People v Treen, 33 Misc 2d 571, 572 [Herkimer County Ct 1962]). Even upon finding that a statute has been violated, a court need not void an agreement if the statute does not expressly state that violations would nullify a contract, and if precluding plaintiff from recovery would be out of proportion to the requirements of public policy (see Benjamin, 85 NY2d at 553; Lloyd, 80 NY2d at 128; cf. Stardial Communications Corp. v Turner Constr. Co., 12 AD3d 181, 182 [1st Dept 2004] [even if salvage contract upon which plaintiff sued violated city code, such a violation was merely malum prohibitum, punishable by *546 means of prescribed regulatory sanctions, and would not preclude plaintiff from recovery]; Specialty Rests. Corp. v Barry, 262 AD2d 926, 928 [3d Dept 1999] [even if defendant’s operation of a restaurant without a liquor license was a violation, it was malum prohibitum and did not preclude plaintiff from recovering on the lease guarantee]). In Lloyd Capital Corp. v Pat Henchar, Inc. (80 NY2d 124, 128 [1992]), the Court of Appeals determined that a loan agreement with an interest rate that violated federal usury laws was malum prohibitum and could be enforced because the statute did not provide for the voiding of contracts due to illegality, and because regulatory sanctions existed that sufficiently protected the underlying public policy, reasoning that “[allowing parties to avoid their contractual obligation[s] is especially inappropriate where there are regulatory sanctions and statutory penalties in place to redress violations of the law” (Lloyd, 80 NY2d at 128; see also Glassman v ProHealth Ambulatory Surgery Ctr., Inc., 14 NY3d 898, 900 [2010] [because regulatory sanctions existed to punish violations of Public Health Law requiring medical facilities’ operating certificate to be used only by the established operator, agreement violating statute could still be enforced]). Moreover, “[a]s a general rule also, forfeitures by operation of law are disfavored, particularly where a defaulting party seeks to raise illegality as ‘a sword for personal gain rather than a shield for the public good’ ” (Lloyd, 80 NY2d at 128, citing Charlebois v Weller Assoc., 72 NY2d 587, 595 [1988]).
Here, notwithstanding that payment of sales commissions to independent contractors is prohibited by the statute, the alleged violation would, in this context, constitute only an offense malum prohibitum and would not preclude plaintiffs recovery (cf. Katz v Zuckermann, 119 AD2d 732 [1986] [arrangement whereby doctor paid technicians a percentage of the fees charged for tests performed by technicians on doctor’s patients found to be malum prohibitum, in violation of Education Law § 6509-a]). Nothing in Public Health Law § 587 indicates that an agreement made in violation thereof would be void. Furthermore, Public Health Law § 588 (2) already provides for sanctions for the violation of Public Health Law § 587, which is defined as a misdemeanor {see Lloyd, 80 NY2d at 128). Moreover, defendants are raising the issue of illegality as a sword for personal gain, as they did not complain of the alleged illegality of the agreements while they received substantial compensation under the arrangement (Kobakhidze even asserts counterclaims in this ac *547 tion for unpaid commissions purportedly owed pursuant to the agency agreement) and are only now seeking to void the agreements, having allegedly breached their commitments under the contract not to divert plaintiffs business to its competitors. Accordingly, even if the court were to find that defendants were not employees of plaintiff, the equities do not require a nullification of the agency agreements, and plaintiff would not be precluded from recovery if the breach is established.
The cases relied upon by defendants do not compel a different result because they arise in distinguishable procedural contexts and involve agreements that violate the core of Public Health Law § 587’s concern, the acceptance by health service purveyors of kickbacks in exchange for referring patient services (see e.g. Matter of Magidson v Dowling, 160 Misc 2d 203 [Sup Ct, NY County 1993] [pathologists who had pleaded guilty to violating Public Health Law § 587 (1) for referring patients to a lab in exchange for commissions contested the Department of Social Services’ decision to exclude the pathologists from participating as Medicaid providers]; Nursing Home Consultants, Inc. v Quantum Health Servs., Inc., 926 F Supp 835 [ED Ark 1996] [under 42 USC § 1320a-7b, an inapplicable statute, court would not enforce marketing agreement under which marketing agent received payment for referring patients to defendant supplier because arrangement violated Federal Medicare statute]; United States v Starks, 157 F3d 833 [11th Cir 1998] [jury instruction omitting element of intent was not error in trial of individuals who referred pregnant women to drug treatment program in exchange for kickbacks because violation was malum in se]). There is no suggestion that, here, any of the parties violated the prohibition against offering or paying kickbacks to health service purveyors in exchange for patient referrals.
For the foregoing reasons, defendants’ motions for summary judgment are denied.

. Paragraph 3.4 (a)-(b) of the agreements states:
“Upon termination of employment, sales agents are required to return all confidential information in their possession to Quality. “Confidential Information includes (1) all information related to such party’s customers, pricing, rates, employees, operations, technology, facilities, markets, products, capabilities, systems, procedures, security practices, research, development, business affairs and finances, ideas, concepts, inventions, designs, business methodologies, improvements, trade secrets, copyrightable subject matter, patents and other intellectual property and proprietary information.”
The non-solicitation provisions are found at paragraph 3.5, which states:
“Agent agrees that for a period of six (6) months after the date of the termination of this Agreement, Agent agrees not to contact or solicit any of the customers who utilize the Laboratory Services as a result of Agent’s sales and marketing efforts for the purpose of switching any of said customers to another provider.”

. As a threshold matter, plaintiffs contention that defendants’ motions are defective because they Eire not supported by pleadings, affidavits, or deposition transcripts as required by CPLR 3212 (b) is unavailing as the court notes that Conti and B&S annex to their notice of motion copies of the pleadings, an affidavit by defendant Conti setting out facts and verifying the statements made in his attorney’s affirmation, and Conti’s agency agreement, and Kobakhidze incorporates those documents by reference in his notice of motion.

. Defined as:
“any person, firm, partnership, group, association, business corporation, not-for-profit corporation, professional corporation, limited liability company, or any agent, employee, fiduciary, employer or representative thereof, including, but not limited to, an entity that provides health-related services, a physician, dentist, podiatrist, chiropractor, either in individual practice, group practice or employed in a facility owned by any person, group, association, firm, partnership, business corporation, not-for-profit corporation, professional corporation, limited liability company, hiring any one of the aforementioned practitioners who provides health or health related services.” (10 NYCRR 34-2.2 [o].)

. Specifically, section 3.2 (j) provides:
“All matters related to marketing materials and advertising to prospective customers shall be determined by Quality. Agent shall use in its marketing/sales activities under this Agreement only advertising, promotional and technical materials prepared by Quality or prepared by Agent and approved by Quality. Agent shall not make any representations orally or in writing that the Laboratory Services are other than specified in Quality’s written materials and publications.”

. Plaintiff submits a partial transcript of Kobakhidze’s deposition. On page 50 of the transcript, Kobakhidze states “And so at that point in time when he asked for invoices I became a salaried employee, and my salary was 2,000 a month. And I was supposed to submit invoices for the difference . . . in order to continue to get my commission through my company.” While this portion of the transcript seems to be relevant to the inquiry, without a complete transcript, it is inappropriate for the court to consider a fragment of a response without context.